IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CV-623-FL

| | | |
|---|---|---|
| PRISCILLA EVERETTE-OATES and DUARTHUR OATES, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | ORDER |
| NORTH CAROLINA DEPARTMENT OF STATE TREASURER; NORTH CAROLINA STATE BUREAU OF INVESTIGATIONS; LOLITA CHAPMAN In Her Individual Capacity and In Her Official Capacity; BETH WOOD In Her Individual Capacity and In Her Official Capacity; VANCE HOLLOMAN In His Individual Capacity and In His Official Capacity; ROBIN HAMMOND In Her Individual Capacity and In Her Official Capacity; SHARON EDMUNDSON In Her Individual Capacity and In Her Official Capacity; GREGORY MCLEOD Director, North Carolina State Bureau of Investigation, In His Individual Capacity and In His Official Capacity; GWENDOLYN KNIGHT In Her Individual Capacity and In Her Official Capacity; ANN HOWELL In Her Individual Capacity and In Her Official Capacity; NORTH CAROLINA LOCAL GOVERNMENT COMMISSION; and NORTH CAROLINA STATE AUDITOR, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on plaintiffs' motion for clarification and for extension of time to file a motion to amend complaint (DE 101). After defendants filed responses in opposition to the motion, upon further direction by the court, plaintiff filed a proposed amended complaint. Defendants then filed supplemental responses, and plaintiffs replied. Also pending is a motion to dismiss filed by defendant Beth Wood ("Wood") (DE 104), which was fully briefed. In this posture, the issues raised are ripe for ruling. For the following reasons, the court construes plaintiffs' motion as a motion to amend complaint, and it is granted in part and denied in part. The motion to dismiss is denied as moot.

## STATEMENT OF THE CASE

Plaintiffs commenced this action on November 10, 2015, in the United States District Court for the Western District of North Carolina, asserting federal constitutional claims and state common law tort claims arising out of a criminal investigation and indictment of plaintiff Priscilla Everette-Oates ("Everette-Oates"). Plaintiffs seek compensatory and punitive damages, as well as injunctive and declaratory relief, on behalf of plaintiff Everette-Oates. Plaintiffs seek compensatory and punitive damages for emotional distress and loss of consortium on behalf of plaintiff Duarthur Oates, husband of plaintiff Everette-Oates.

On September 28, 2016, the court granted motions to dismiss by defendants, and dismissed all claims against all defendants, except for one claim against defendant Wood in her individual capacity (False Public Statements and Seizure, under 42 U.S.C. § 1983). Dismissal was without prejudice for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. The court directed the clerk to continue management of the case as to the claim against defendant Wood.

Plaintiffs filed the instant motion on October 25, 2016, requesting: 1) clarification whether the court prefers filing of a new complaint or motion for leave to amend, 2) leave to file an amended complaint, and 3) extension of time to file a proposed amended complaint. On October 27, 2016, defendant Wood filed a motion to dismiss the sole remaining fourth claim for relief against her in the original complaint, which motion was fully briefed.

In the meantime, defendants responded in opposition to plaintiffs' motion, each noting inter alia that assessment of the motion was hindered because no proposed amended complaint was filed with the motion. On December 6, 2016, In furtherance of the court's consideration of plaintiffs' motion, the court ordered plaintiffs to file within 14 days hereof their proposed amended complaint and thereafter, any defendants who wished to supplement responses of record with reference to same, were allowed to file a supplement to response within 14 days, and plaintiffs within 7 days thereafter a reply. Plaintiffs filed a proposed amended complaint on December 29, 2016. Defendants filed supplements to their responses, and plaintiffs replied.

In the proposed amended complaint, the sole named plaintiff is plaintiff Everette-Oates (hereinafter "plaintiff," where referenced singularly). Plaintiff asserts six claims for relief under 42 U.S.C. §§ 1983 and 1985:

1.    Malicious Prosecution and Seizure § 1983

2.    Concealment of Evidence and Seizure § 1983

3.    Fabrication of Evidence and Seizure § 1983

4.    Civil Conspiracy in Violation of § 1983

5.    Denial of Equal Protection of the Laws § 1985(2)

6.    Denial of Equal Protection of the Laws § 1985(3)

3

In asserting these six claims, plaintiff abandons for purposes of the proposed amended complaint a number claims originally asserted in the original complaint, including the sole remaining fourth claim for relief in the original complaint ("False Public Statements and Seizure § 1983"). Plaintiff also no longer asserts state law claims for relief.

Plaintiff seeks compensatory and punitive damages, as well as declaratory relief, against all defendants named in the original complaint (as set forth in the caption of this order), with a few exceptions. In particular, plaintiff no longer seeks relief against any government agencies or entities, or individuals in their official capacities, except for defendants Gwendolyn Knight ("Knight") and Ann Howell ("Howell"), who are named in their individual and official capacities. Plaintiff also adds one defendant, Barry Long ("Long"), "North Carolina Department [sic] State Auditor," in his individual capacity. (Prop. Am. Compl. ¶ 9).

## SUMMARY OF ALLEGED FACTS

The facts alleged in the proposed amended complaint may be summarized as follows. Plaintiff served as mayor of Princeville, North Carolina, (the "town"), from 2003 to 2005, and from 2010 to 2013. "For many reasons, including Hurricanes Floyd and Irene, the town has experienced financial challenges." (Prop. Am. Compl. ¶ 96). "[F]ollowing Hurricane Floyd in 1999 which left the town underwater for 10 days," the town was "earmarked" to receive $26,000,000.00 in Federal Emergency Management Agency ("FEMA") "emergency disaster relief" funds. (Id. ¶ 16).

For some time preceding plaintiff's second term as mayor, the town's budget was in "the 'red'" or in "the negative," and, as of 2010, the town had submitted audited financial statements to Local Government Commission ("LGC"), which is a division of the Department of State Treasurer

("DST"),[1] on an annual basis for two consecutive years.  (Id. ¶ 25).   Near the beginning of her

second term as mayor, in about December 2010, plaintiff received a letter from defendant

Edmundson, who is a certified public accountant (CPA) and employee of DST, in the position of

Director, Fiscal Management Section, of DST, stating:

> We note that the Town has made progress in a number of areas.  The Town's audited
> financial statements were submitted to our office on a timely basis for the second
> consecutive year, the Town's General Fund balance available increased, and the
> financial position of the Water and Sewer Fund has improved.  We commend the
> Town's governing Board, staff, and citizens for these improvements . . . . June 30,
> 2010 was 15.85%, which represents a significant improvement from the negative
> 0.61% at June 30, 2009.

(Id.).   An audit of town finances for 2010 "included a Material Weakness Finding," which stated:

"Documentation for some checks were missing.  Check numbers recorded in the general ledger did

not agree with check numbers listed on the bank statements.  Duties were not adequately segregated

among accounting functions."  (Id. ¶ 52).  An additional audit of 2011 town finances was completed

in April 2012, the results of which are not alleged in the complaint.

During both her terms as mayor, plaintiff requested certain information and reports regarding

prior allocation and expenditure of FEMA funds designated for the town.  Plaintiff transmitted such

requests to several defendants in this action, particularly defendant Holloman, then-director of LGC;

---

[1] LGC is a division of DST, an executive department of the state government, created by statute.  See N.C. Gen. Stat. § 159-3(e).  Pursuant to state regulations, LGC is, and was at all times relevant to this matter, "the state's agency charged with the duty of advising and assisting officials, of local governments (counties, cities, towns, public authorities, special districts) in all phases of fiscal management."  20 N.C. Admin. Code 03.0101 (2010 - 2016).  "It promotes the efficient use of monetary resources of local governments through sound fiscal management, careful borrowing, and sound debt management practices."  Id.  The LGC "consists of nine members," including, as pertinent here, the "State Treasurer," and the "State Auditor."  N.C. Gen. Stat. § 159-3(a).  The LGC appoints a secretary who serves as a department head and director of the LGC. See 20 N.C. Admin Code 03.0101.

as well as defendant Wood, who is the North Carolina State Auditor.[2]  Plaintiff Everette-Oates also sent such requests for information to defendant defendants Knight and Howell, who were two commissioners on the town's five-member board of commissioners.

In making such requests, plaintiff was concerned that some individuals, including defendants Howell and Knight, had received FEMA funds following Hurricane Floyd without justification, and that they had been involved in allocating FEMA funds improperly to others without justification, during the time period around 2000 to 2002.  The LGC and defendants Holloman, Wood, Knight, and Howell, did not provide plaintiff with the information she requested.

On July 30, 2012, during a meeting of the LGC, plaintiff furnished defendant Wood with documentation alleging that the former town mayor and two current commissioners had committed illegal acts between 2000 and 2002.  Plaintiff portrayed these alleged illegal acts "as being far more egregious than any [then-]existing concerns about the town."  (Id. ¶¶ 26, 30).

The next day, on July 31, 2012, under direction of defendant Wood, the LGC and Department of State Treasurer, and defendants Holloman, Hammond, and Edmundson, seized and took possession of financial books and records of the town, and took control of "its bookkeeping." (Id. ¶¶ 31, 57).[3]  Collection of such books and records was ongoing for some time, with LGC staff

---

[2]  The North Carolina State Auditor is an executive department of the state, created by statute.  See N.C. Gen. Stat. § 147-4.  The Auditor is responsible for "promot[ing], to the extent possible, coordinated nonduplicating audits of public programs and activities of all governmental levels throughout the State."  N.C. Gen. Stat. § 147-64.2. "State officials may make written requests that the Auditor undertake, to the extent deemed practicable and within the resources provided, a specific audit or investigation; provide technical assistance and advice; and provide recommendations on management systems, finance, accounting, auditing, and other areas of management interest."  N.C. Gen. Stat. § 147-64.5.

[3]  The LGC has authority by statute "to impound the books and records of any unit of local government or public authority and assume full control of all its financial affairs (i) when the unit

6

members stationed at the town hall through 2013. Included in such books and records seized were all receipts, documents, notes, invoices, and electronically filed receipts and documents from the town's city hall, including all receipts verifying all expenditures by plaintiff.

In August 2012, defendant Holloman cancelled a contract that the town had signed with an independent CPA to locate FEMA funds "due and owing" to the town. (Id. ¶ 37). That same month, defendant Edmundson sent a letter to plaintiff, on behalf of LGC, suggesting that LGC was interested in looking at receipts verifying plaintiff's credit card expenses as mayor. Plaintiff asked then-town manager Maggie Boyd ("Boyd") and then-town clerk Diana Draughn ("Draughn") to confirm that all of her receipts and supporting documents were in the town's filing cabinet, in a folder labeled "Mayor Oates PNC Bank Credit Cards." (Id. ¶ 32). Boyd and Draughn did so, confirming that all receipts and documents were intact, for the period from 2010 to August 2012, with the exception of only five items without receipts. (Id. ¶ 34).

In September 2012, defendant Edmundson, on behalf of LGC, sent another letter, specifically seeking documentation and receipts verifying credit card expenses for the PNC Bank charges. The letter included an attached spreadsheet that contained verification that there were 78 items for which receipts had been identified, and an unspecified number of items for which receipts had not been

---

or authority defaults on any debt service payment or, in the opinion of the Commission, will default on a future debt service payment if the financial policies and practices of the unit or authority are not improved, or (ii) when the unit or authority persists, after notice and warning from the Commission, in willfully or negligently failing or refusing to comply with the provisions of [Chapter 159 of the North Carolina General Statutes, titled Local Government Finance]." N.C. Gen. Stat. Ann. § 159-181(c). "When the [LGC] takes action under this section, the [LGC] is vested with all of the powers of the governing board as to the levy of taxes, expenditure of money, adoption of budgets, and all other financial powers conferred upon the governing board by law." Id.

identified.[4] In response to the latest letter, plaintiff asked Boyd and Draughn to pull again the folder labeled "Mayor Oates PNC Bank Credit Cards" from the town hall files, but at that time the folder was gone. (Id. ¶ 34). Boyd asked LGC staff to return to her for her review the entire folder labeled "Mayor Oates PNC Bank Credit Cards." (Id.). LGC staff on site stated that they did not know where the folder was, and they transmitted to plaintiff only an eight page facsimile transmission from defendant Edmundson, which showed copies of 19 receipts. (Id. ¶ 35; see DE 114-13).

Defendant Edmundson allegedly had reviewed and had in her possession at that time the entire folder labeled "Mayor Oates PNC Bank Credit Cards," which, as noted above, allegedly contained receipts and supporting documentation for all of plaintiff's credit card expenditures from 2010 to August 2012, except for five undocumented items. (Id. ¶¶ 33-35). By October 2012, Edmundson also had a schedule verifying two of the five undocumented items. (Id. ¶ 36).

On October 8, 2012, defendant Edmundson met with defendants Wood, Holloman, Hammond, and Long, who holds the title of supervisor of fraud investigations with the State Auditor's office, and discussed plaintiff's concerns about fraudulent misapplications of FEMA funds by past town officials. It is alleged that Edmundson delivered the entire folder labeled "Mayor Oates PNC Bank Credit Cards" to these defendants at the meeting, and that these defendants agreed at that time "to seek the SBI's assistance to prosecute plaintiff for embezzlement due to a lack of 'supporting documentation' and receipts, which they had in their possession, had reviewed, and knew perfectly well were needed by [plaintiff] to prove her innocence." (Id. ¶ 38). On October 23, 2012, defendant Long met with SBI agents and identified defendant Chapman as an SBI financial

---

[4] Neither the alleged letters from defendant Edmundson, nor the allegedly attached spreadsheet, are attached to the complaint.

crimes agent who "works in the Edgecome County area," "who may be able to assist." (Id. ¶ 39).

They agreed also to apprise the Edgecombe County District Attorney of "what we're planning to

do in Princeville." (Id.).

On October 29, 2012, defendant Long, having previously identified defendant Chapman,

knowing she was an "African-American" SBI agent, sent an email to Cheryl McNeill ("McNeill"),

a supervisor with defendant SBI, stating as follows:

> We are conducting an investigation regarding fraud, waste, or abuse of public funds
> in the town of Princeville.  It would be extremely helpful if you would be willing to
> assign one of your Financial Crimes agents to work with us during various phases
> of our engagement, but especially during the interview process.  We are sensitive to
> the fact that some people may attempt to portray any investigation of the town's
> finances as a racial issue.  Because of this, the assignment of an African American
> agent would be preferable in terms of relieving any anxiety on the part of
> Princeville's citizenry in this regard.

(Id. ¶ 40; see DE 114-7).  On October 30, 2012, McNeill sent a letter to defendant Long, "RE: Fraud

of Public Funds in the Town of Princeville," stating: "In response to your request for an

investigation in the above referenced matter, [defendant] Chapman has been assigned to this

investigation.  Agent Chapman will contact you with her findings." (Id. ¶ 41; see DE 114-8).

In November and December 2012, it is alleged, defendant Chapman met regularly, two or

three times per week, with defendants Holloman, Edmundson, Hammond, Wood, and Long, "in

order to strategize on how best to ensure a finding of misappropriation by [plaintiff]." (Id. ¶ 43).

During these meetings, these defendants allegedly viewed with defendant Edmundson the folder

labeled "Mayor Oates PNC Bank Credit Cards," including its contents including "all attached

receipts and supporting documents spanning the entirety of the Mayor's administration." (Id.).  At

such meetings, it is alleged, these defendants "discussed their plan of having [defendant Chapman]

present false testimony to the Grand Jury to secure a 'True Bill' Indictment and criminally prosecute

[plaintiff]," by concealing the existence of receipts and supporting documents verifying business purpose of all expenditures.  (Id.; see id. ¶ 76).

Between January 2013 and July 2013, defendants Howell and Knight frequently communicated with defendants Holloman, Edmundson, and Wood, regarding the town's financial conditions.  In such communications, defendants Howell and Knight also urged defendants Holloman, Edmundson, and Wood, "to investigate" plaintiff, who was the "political opponent" of defendants Howell and Knight, in order to silence plaintiff's investigation of defendant Howell and Knight's involvement in misappropriation of FEMA funds.  (Id. ¶ 49).

On March 28, 2013, defendants Howell and Knight, along with Calvin Sherrod ("Sherrod"), comprising three out of five members of the town's board of commissioners, convened a meeting of the board of commissioners, wherein the board "passed a 'resolution' directing [defendant Wood] to proceed with an investigation of improper use of Town of Princeville funds by [plaintiff] and to disregard [a] Response Memorandum communicated by Town of Princeville Town Attorney Charles Watts, outlining a substantial amount of exculpatory evidence."  (Id. ¶ 51, 54).

On April 8, 2013, defendant Wood published an "Investigative Report" on the "Town of Princeville" (hereinafter the "Report").  (Id. ¶¶ 55, 82, 83, 90, 91; see DE 104-1).[5]  In the Report, defendant Wood states that plaintiff used a town credit card between August 2010 and July 2012 "to purchase various items without providing receipts or documenting the business purpose at the time

---

[5] A copy of the April 2013 Report is attached to defendant Wood's motion to dismiss.  (See DE 104-1).  For purposes of the instant motions, the court takes judicial notice of the fact of publication of the report and the fact that certain statements were made therein, but not of the truth of the matter asserted in any statements therein.

of the expenditure." (DE 104-1 at 13).[6] The Report describes $8,115 in credit card charges "not supported by receipts," and a "majority" of total charges of $13,018, which "did not have a clearly documented business purpose." (Id.). The Report suggests that "[s]upporting documentation for travel reimbursements should . . . include a travel authorization form with proper approval documenting the reason and nature of the expenditure with the appropriate receipts and invoices attached." (Id. at 15).

On May 7, 2013, defendant Long provided defendant Chapman with a copy of plaintiff's town "travel expense reports." (Prop. Am. Compl. ¶ 56; DE 114-14). These travel expense reports provide entries pertaining to expenditures made by plaintiff between August 2010 and May 2011. (DE 114-14 at 4-13). Each of these travel expense reports includes a certification by Draughn stating: "I have examined and verified the information on this report and certify that the expenses incurred are necessary and properly reported." (Id.).

On June 6, 2013, defendant Long provided defendant Chapman with a copy of the town's "Comprehensive Economic Development Plan," which references "Economic Development" work by the town and "Economic Development Progress Items," including conferences and meetings in Washington DC, and "[b]uild[ing] new working relationships." (E.g., DE 114-16, -20, -23). Further, defendant Chapman had reviewed a folder seized from the town's records labeled "Economic Committee" containing all the documents pertaining to the town's "Comprehensive Economic Development Plan." (Prop. Am. Compl. ¶ 62).

_____

[6] For citations with docket entry numbers specified (DE), page numbers cited are those provided on the court's case management electronic case filing (CM/ECF) system, not the page number specified on the face of the underlying document.

On June 26, 2013, defendant Chapman received from the State Auditor's office a spreadsheet documenting plaintiff's credit card charges, including notations specifying charges with supporting documentation showing "expenditures were made for business purposes for the town" for dates ranging from August 2010 to July 2012. (Id. ¶ 70; see DE 114-15). An email accompanying the spreadsheet from District Attorney Tonya Montanye to defendant Chapman notes "additional dates are for places that she did have receipts for." (DE 114-15 at 3).

On June 26, 2013, defendant Hammond sent an email to town officials, including plaintiff and defendants Howell and Knight, requesting to have the board of commissioners hold a special meeting "to approve or disallow" certain expenditures so that the LGC "can complete the financial records and prepare for the Town's annual audit." (Prop. Am. Compl. ¶ 77). With reference to town credit cards, defendant Hammond stated:

> If the board did not authorize acquisition of the cards or did not authorize their use for the charges in question, the charges must not be so categorized. Similarly, certain expense reimbursements to Mayor Oates . . . if authorized, should be shown as town business expenditures for 2012-13. If these reimbursements were not authorized, they must not be so categorized.

(Id.).

On July 8, 2013, the town board of commissioners voted three to one to allow the LGC to investigate certain credit card charges and travel expenses of plaintiff. Three members of the board of commissioners, including defendants Howell and Knight, "voted to disallow the credit card expenses and expenditures to be categorized as usual in the 2012-2013 budget." (Id. ¶ 80). A contrary vote allegedly would have "resolved the matter of the subject credit card expenses," whereas the vote to disallow "kept the credit card expenditures under investigation." (Id.).

On July 29, 2013, it is alleged, Edgecomb County District Attorney Robert Evans ("DA Evans") stated to plaintiff's personal attorney that, if plaintiff resigned as mayor of the town and abandoned plans to seek re-election, DA Evans would decline to take the case to a grand jury. On July 30, 2013, plaintiff sent a resignation letter to DA Evans, stating: "I have made the decision to resign my office as Mayor and withdraw as candidate for reelection." (Id. ¶ 96). On August 1, 2013, DA Evans informed plaintiff's attorney that DA Evans was going to meet with defendants Holloman, Wood, Chapman, and staff of defendant LGC on August 2, 2013. DA Evans further made an appointment to speak with plaintiff's attorney on August 5, 2013, to discuss the terms of an agreement not to seek re-election in exchange for DA Evans declination to present the case to a grand jury.

On August 2, 2013, it is alleged, DA Evans met with defendants Holloman, Edmundson, Hammond, Wood, and Chapman, and they discussed and agreed to arrest, seize, search, prosecute, and imprison, plaintiff for 17 felonies of embezzlement by a public official. At that time, defendants Holloman, Edmundson, Hammond, Wood, and Chapman failed to reveal to DA Evans the receipts and documentation verifying business purpose of plaintiff's credit card expenditures, which had been reviewed by defendants Holloman, Edmundson, Hammond, Wood, and Chapman. Rather, they represented to DA Evans that there were no receipts or documentation verifying business purpose for plaintiff's credit card expenditures.

On August 5, 2013, it is alleged, defendant Chapman testified before a grand jury of the Superior Court of Edgecombe County ("Superior Court"), causing a 17 felony count bill of indictment to be issued against plaintiff. In particular, Chapman allegedly testified that there were no receipts or documentation verifying business purpose for plaintiff's credit card expenditures set

13

forth in the indictment. The 17 charges in the indictment are for "embezzlement by local officer or employee," in violation of N.C. Gen. Stat. 14-92, which provides:

> If an officer, agent, or employee of an entity listed below [being a county, a city or other unit or agency of local government], or a person having or holding money or property in trust for one of the listed entities, shall embezzle or otherwise willfully and corruptly use or misapply the same for any purpose other than that for which such moneys or property is held, such person shall be guilty of a felony.

N.C. Gen. Stat. § 14-92. For example, the ninth charge in the indictment states:

> [O]n or about the 1st day of April, 2011, up to and including the 25th day of April, 2011, in the county named above [Edgecomb County] the defendant named above [plaintiff] unlawfully, willfully and feloniously did embezzle and corruptly use and misapply $395.43, property belonging to the Town of Princeville, by charging that amount on credit card number XXXX-XXXX-XXXX-1926, a credit card issued to the Town of Princeville, and incurring those charges and fees. At the time the defendant held the position of Mayor of the Town of Princeville, as an officer of that town, and in that capacity had been entrusted with the property described above. This act is in violation of G.S. 14-92.

(DE 114-4 at 3). The indictment includes 16 similar charges, describing credit card expenditures ranging in date from August 2010 to January 2012, and in amounts from $74.21 to $530.21, each.

On August 6, 2013, DA Evans instructed plaintiff, through her attorney, that she must surrender on August 7, 2013, at Superior Court in order to have the indictment papers served on her and to get a bond set for release. Following initial appearance in court on August 7, 2013, defendant Chapman caused plaintiff to be fingerprinted, and plaintiff was released on $7,500.00 unsecured bond.

At a September 8, 2014, hearing in Superior Court, the court ordered defendant LGC to comply with an outstanding subpoena, and to permit onsite inspection by plaintiff's attorneys and state prosecutors. According to a subsequent order by the Superior Court, during an onsite visit at offices of defendant LGC, on September 10 and September 11, 2014:

14

counsel for the State, Tonya O. Montanye, and [plaintiff], Ryan D. Stump, discovered documents in the exclusive possession of [defendant] LGC that are exculpatory in nature. Specifically, receipts that contained business purposes on the back, that neither the State nor Defendant had previously seen or been provided. Counsel for the parties discovered approximately 35,000-50,000 relevant pages of documents in the exclusive possession of the LGC that [were] relevant to [the criminal prosecution of plaintiff].

(DE 114-5 ¶¶ 9-11; see Prop. Am. Compl. ¶ 121). "The documents were being kept in a file room in which the boxes related to the Town of Princeville essentially filled the room." (Prop. Am. Compl. ¶ 121).

Additionally, on September 11, 2014, just prior to counsel for both sides completing their onsite review, Defendant Sharon Edmundson notified counsel that she had 'a few' things in her office related to the Town of Princeville. Defendant Edmundson stated that the documents 'weren't anything of importance' but that the visiting counsel could go through them to see if they were of any relevance. During review of the documents in Defendant Edmundson's office, all original receipts with the expenditure purpose written on the back were found. In addition, a folder labeled 'Economic Development Committee' was found. . . . [This] documentation had been selectively 'plucked' from the boxes full of documents and was kept separate and apart. . . ."

(Id. ¶123).

The documents kept separate and apart in defendant Edmundson's office included the folder labeled "Mayor Oates PNC Credit Card," including its contents comprising all original receipts with the expenditure purpose written on the back and supporting documents. (Id. ¶ 123). In addition, documents included a second folder labeled "Economic Development Committee," which contained documentation proving the existence of an "Economic Development Committee" for the town. (Id.). During their onsite review, prosecutors remarked that they had never seen either folder. (Id. ¶124). Defendants Chapman, Long, Wood, Edmundson, Hammond, however, allegedly had been aware of the documents kept separate and apart in defendant Edmundson's office, and had reviewed their contents, previously as far back as their initial meetings in October 2012.

On September 22, 2014, the Superior Court ordered defendant LGC to provide to the parties in the criminal prosecution of plaintiff copies of the 35,000-50,000 documents discovered during the onsite visit, at the expense of defendant LGC.  (Id. ¶ 127).

On March 18, 2015, the district attorney, Montanye, filed a dismissal of all 17 charges against plaintiff.  Montanye stated the following reason for dismissal: "Information discovered subsequent to indictment has come into consideration so that criminal prosecution is not in interest of justice."  (Id. ¶ 129).

## DISCUSSION

A.    Standard of Review

Where, as here, a party seeks leave to amend after a responsive pleading or Rule 12(b) motion has been filed, the party "may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  Id.  "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"  Foman v. Davis, 371 U.S. 178, 182 (1962).

With respect to futility, the court may deny leave to amend "if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards."  Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011).  A complaint states a claim if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [the] evidence" required to prove the claim. Twombly, 550 U.S. at 556. In evaluating the complaint, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.     Analysis

1.     Grounds for denial other than futility

Defendants assert various grounds for denial of plaintiffs' motion for leave to amend other than futility, which the court considers as an initial matter. For the reasons stated below, these arguments for denial of the instant motion are without merit.

Defendants argue, for example, that plaintiffs unduly delayed in moving to amend complaint, where plaintiffs could have so moved at any point after defendants filed their initial motions to dismiss in this matter. Defendants' motions to dismiss, however, raised issues for resolution by the court and did not in themselves obligate plaintiffs to seek to amend complaint before the court resolved the issues raised by the motions. The court's order granting dismissal as to certain claims noted areas where the original complaint lacked factual allegations sufficient to state a claim, and denied multiple claims without prejudice on that basis. (DE 93). Where the claims were denied without prejudice, plaintiff's motion for leave to amend, initially filed within 21 days of the court's order, was not unduly delayed.

Defendants also suggest that plaintiffs must first file a motion to alter or amend judgment, and that they must demonstrate newly discovered evidence or facts, in order to succeed on such motion. The court, however, has not entered a final judgment in this matter. Therefore, standards for altering or amending judgment, see, e.g., Fed. R. Civ. P. 59(e) & 60(b), are not applicable to the instant motion to amend. In any event, the standard for considering a post-judgment motion to amend is not that stated in Rule 59(e) or 60(b), but rather the standard in Rule 15(a). See Katyle, 637 F.3d at 471 ("[A] court should evaluate a postjudgment motion to amend the complaint 'under the same legal standard as a similar motion filed before judgment was entered for prejudice, bad faith, or futility.'" (quoting Laber v. Harvey, 438 F.3d 404, 427 (4th Cir.2006) (en banc)).

In sum, the court rejects defendants' arguments for denial of the instant motion to amend, apart from the issue of futility, to which the court turns next.

2. Futility

As described above, in the proposed amended complaint, plaintiff asserts six claims against defendants Chapman, Wood, Holloman, Hammond, Edmundson, Mcleod, Long, Knight and Howell (hereinafter, collectively, "defendants"). The court proceeds to evaluate each claim for whether plaintiff has asserted a claim upon which relief can be granted.

a. Malicious Prosecution and Seizure

Plaintiff asserts a claim under 42 U.S.C. § 1983 against defendants for malicious prosecution and seizure. Section 1983 "does not empower a plaintiff to bring a claim for malicious prosecution simpliciter." Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000) (emphasis in original). "What is conventionally referred to as a '§ 1983 malicious prosecution' action is nothing more than a § 1983 claim arising from a Fourth Amendment violation." Id. "To state such a claim, a plaintiff

must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012). "[A]n indictment, fair upon its face, returned by a properly constituted grand jury, conclusively determines the existence of probable cause." Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012).

Here, plaintiff's claim based upon malicious prosecution and seizure fails because the indictment alleged in the complaint, and attached thereto, conclusively determines the existence of probable cause. (See DE 114-4). Plaintiff must instead allege additional conduct preceding the indictment in order to state a claim under § 1983, which type of claim is discussed in more detail below. Accordingly, plaintiff's claim based upon malicious prosecution and seizure (first cause of action) is futile, and plaintiff's motion to amend complaint to add this claim is denied in this part.

b. Concealment and Fabrication of Evidence

Plaintiff asserts claims for concealment and fabrication of evidence, in violation of § 1983 (second and third causes of action) against defendants.

"Notwithstanding the conclusive effect of the indictment[], . . . a grand jury's decision to indict will not shield a police officer who deliberately supplied misleading information that influenced the decision." Durham, 690 F.3d at 189 (internal quotations omitted). To state a claim for a constitutional violation on this basis, a plaintiff must allege facts permitting an inference of "the requisite intent to mislead." Evans, 703 F.3d at 651 (quoting United States v. Colkley, 899 F.2d 297, 299-301 (4th Cir.1990)).

Specifically, plaintiff must allege that a police officer "deliberately or with a reckless disregard for the truth made material false statements . . . or omitted from [an] affidavit material

facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." Miller v. Prince George's Cty., MD, 475 F.3d 621, 627 (4th Cir. 2007) (internal quotations omitted); see Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 914, 919 (holding that plaintiff stated a § 1983 claim based on Fourth Amendment violation where "a judge relied on allegedly fabricated evidence to find probable cause that he had committed a crime," particularly "police fabrications about [seized pills'] content" asserted to be illegal substances).

"'Reckless disregard' can be established by evidence that an officer acted with a high degree of awareness of a statement's probable falsity, that is, when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Id. "With respect to omissions, reckless disregard can be established by evidence that a police officer failed to inform the judicial officer of facts he knew would negate probable cause." Id. In sum, "police officers cannot intentionally lie in . . . affidavits, or recklessly include or exclude material information known to them." Id. at 630.

By contrast, "[a] plaintiff's allegations of negligence or innocent mistake by a police officer will not provide a basis for a constitutional violation." Id. at 627-28. "It is also plain that an officer is not required to exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." Id. at 630. Accordingly, an officer's mere "failure to disclose exculpatory evidence" does not state a claim for a constitutional violation. Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005). "Affiants are not required to include every piece of exculpatory information in affidavits," and an "omission of facts inconsistent with a suspect's guilt from an affidavit" may not constitute "an attempt to mislead the magistrate." Evans, 703 F.3d at 651.

In this case, plaintiff has pleaded alleged facts that, when viewed in light most favorable to plaintiff, state a claim against defendant Chapman for having concealed or fabricated material evidence in presentation to the grand jury, in violation of plaintiff's Fourth Amendment rights. In particular, it is plausible to infer from plaintiff's factual allegations that defendant Chapman represented to the grand jury that there were no receipts or documentation verifying business purpose for plaintiff's credit card expenditures charged in the indictment, when in fact, according to the allegations in the complaint, there were receipts and documentation verifying a business purpose for all of those credit card expenditures. It is further plausible to infer that defendant Chapman had knowledge of the receipts and documentation verifying a business purpose for all of those credit card expenditures but deliberately withheld that information from the grand jury.

Moreover, the existence of receipts and documentation verifying a business purpose for plaintiff's credit card expenditures charged in the indictment was material to the probable cause determination for the charged offense of embezzlement by a public officer. Under North Carolina law, it is an essential element of the charge of embezzlement by a public officer that the accused "willfully and corruptly use or misapply the [funds] for any purpose other than that for which such moneys or property is held." N.C. Gen. Stat. § 14-92 (emphasis added). Accordingly, where defendant Chapman is alleged to have represented to the grand jury that there was no documentation of a town purpose for any of plaintiff's credit card expenditures charged in the indictment, where there in fact was documentation of a town purpose for all of plaintiff's credit card expenditures charged in the indictment, the misrepresentation to the grand jury was material.

In contrast to the original complaint, plaintiff has included with the proposed amended complaint allegations of sufficient specificity to give rise to a plausible inference that defendant

Chapman had documentation of a town purpose for all of plaintiff's credit card expenditures. These include the following allegations:

1) Chapman reviewed in November 2012 the folder labeled "Mayor Oates PNC Bank Credit Cards," including its contents including "all attached receipts and supporting documents spanning the entirety of the Mayor's administration" (Prop. Am. Compl. ¶ 43);

2) In May 2013, Chapman reviewed plaintiff's "travel expense reports," wherein all expenditures were certified by the town clerk to be "<u>necessary</u> and properly reported" (<u>E.g.</u>, DE 114-14 at 4) (emphasis added); (<u>see</u> Prop. Am. Compl. ¶ 56);

3) In June 2013, defendant Chapman received from the State Auditor's office a spreadsheet documenting plaintiff's credit card charges, including notations specifying charges with supporting documentation showing "expenditures were made for business purposes for the town" for dates ranging from August 2010 to July 2012, (<u>Id.</u> ¶ 70; <u>see</u> DE 114-15), and an email accompanying the spreadsheet from District Attorney Tonya Montanye to defendant Chapman notes "additional dates are for places that she did have receipts for." (DE 114-15 at 3).

In sum these allegations are sufficient to state a claim against defendant Chapman based upon fabrication and concealment of evidence in violation of § 1983. With respect to all defendants other than defendant Chapman, however, plaintiff does not allege that any of them made any representations to the grand jury concealing or fabricating evidence bearing upon probable cause. Accordingly, plaintiff has not stated a claim against the remaining defendants for concealing or fabricating evidence in violation of the Fourth Amendment. Plaintiff may, however, state a claim against these remaining defendants if they caused defendant Chapman to fabricate or conceal

evidence before the grand jury in violation of plaintiff's Fourth Amendment rights, or if they conspired with defendant Chapman to do so. The court addresses these theories of relief in conjunction with plaintiff's conspiracy claim in the next section below.

In sum, plaintiff states a § 1983 claim only against defendant Chapman for concealment and fabrication of evidence (counts two and three of the proposed amended complaint). In this part, plaintiff's motion to amend complaint is granted.

        c.     Conspiracy

Section 1983 imposes liability on any person who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights." 42 U.S.C. § 1983. The Fourth Circuit has interpreted § 1983 to encompass a cause of action for conspiracy. "To establish a civil conspiracy under § 1983," a plaintiff must allege that defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, W.Va., 81 F.3d 416, 421 (4th Cir. 1996). It is "a weighty burden to establish a civil rights conspiracy." Id. "While [a plaintiff] need not produce direct evidence of a meeting of the minds," a plaintiff must allege "that each member of the alleged conspiracy shared the same conspiratorial objective." Id. A plaintiff's allegations "must, at least, reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Id.

Plaintiff has alleged sufficient facts to state a claim for § 1983 conspiracy to deprive plaintiff of her Fourth Amendment right to be free from unreasonable seizure, against defendants Chapman, Wood, Holloman, Hammond, Edmundson, and Long. In particular, plaintiff alleges that these defendants met and discussed a common conspiratorial objective: On October 8, 2012, it is alleged,

defendant Edmundson met with defendants Wood, Holloman, Hammond, and Long; they reviewed the entire folder labeled "Mayor Oates PNC Bank Credit Cards"; and they agreed at that time "to seek the SBI's assistance to prosecute plaintiff for embezzlement due to a lack of 'supporting documentation' and receipts, which they had in their possession, had reviewed, and knew perfectly well were needed by [plaintiff] to prove her innocence." (Id. ¶ 38). In November and December 2012, it is alleged, defendant Chapman met regularly, two or three times per week, with these defendants; she reviewed the same documentation with them; and they "discussed their plan of having [defendant Chapman] present false testimony to the Grand Jury to secure a 'True Bill' Indictment and criminally prosecute [plaintiff]," by concealing the existence of receipts and supporting documents verifying business purpose of all expenditures. (Id. ¶¶ 43, 76). Finally, it is alleged that defendant Chapman ultimately testified in accordance with their plan before the grand jury on August 6, 2013, (Prop. Am. Compl. ¶ 100).

In sum, these alleged facts permit a reasonable inference that defendants Wood, Holloman, Hammond, Edmundson, and Long caused Chapman to testify as planned, and that defendant Chapman joined in and carried out an overt act in furtherance of the conspiratorial objective, resulting in the deprivation of plaintiff's Fourth Amendment rights. Therefore, plaintiff states a §1983 claim against defendants Wood, Holloman, Hammond, Edmundson, and Long, for causing a constitutional violation and for § 1983 conspiracy, along with defendant Chapman. In this part, plaintiff's motion to amend is granted.

By contrast, plaintiff has not stated a § 1983 claim against defendant Gregory McLeod ("McLeod"), Director of the SBI, nor defendants Knight and Howell, either on a theory of causing a § 1983 violation or § 1983 conspiracy. Plaintiff alleges no participation on their part in the

meetings described above in October, November, and December 2012, in which the conspiratorial plan was formulated. Plaintiff also does not allege their participation in any other communications for purposes of discussing prosecution of plaintiff on the basis of fabricated evidence or concealed evidence regarding plaintiff's credit card expenditures. Accordingly there is no plausible basis for inferring that they "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan" with defendants Wood, Holloman, Hammond, Edmundson, and Chapman. Hinkle, 81 F.3d at 421.

With respect to defendants Howell and Knight, plaintiff includes multiple allegations regarding their communications with various defendants, as well as their participation in board meetings prior to the indictment, suggesting that this conduct is sufficient to implicate Howell and Knight in the alleged § 1983 conspiracy. These allegations, however, are insufficient to state a § 1983 claim against Howell and Knight.

For example, plaintiff alleges that defendants Howell and Knight shared a common motivation to oust plaintiff from position as mayor through prosecution, in order to avoid inquiry into misallocation of FEMA funds by defendants. (Prop. Am. Compl. ¶ 49). Plaintiff also alleges that defendant Knight publicly accused plaintiff of using town money for personal use after the Report was published. (Id. ¶ 93). Common motivation and public accusations, however, are not sufficient to implicate defendants Howell and Knight in the specific alleged conspiracy to fabricate and conceal evidence of plaintiff's credit card expenditures before the grand jury. Their alleged common desire to oust and prosecute plaintiff is not itself a conspiracy to deprive plaintiff of a constitutional right. Cf. Scott v. Greenville Cty., 716 F.2d 1409, 1424 (4th Cir. 1983) ("[E]ven overtly biased citizens who write letters, speak up at public meetings, or even express their

prejudices in private meetings with public officials without formulating a joint plan of action are not 'conspiring' with those officials in a way that subjects them to § 1983 liability.").

Plaintiff also alleges that defendants Howell and Knight frequently communicated with defendants Holloman, Edmundson, and Wood, "making false reports of the Town's financial conditions and urging Defendants to investigate" plaintiff. (Prop. Am. Compl. ¶ 49). Plaintiff asserts they joined the conspiracy by convening a board meeting in March 2013 to pass a resolution directing defendant Wood to proceed with an investigation of improper use of town funds by plaintiff. (Prop. Am. Compl. ¶¶ 51, 54). These defendants also allegedly comprised part of the vote to allow LGC to "disallow the credit card expenses and expenditures to be categorized as usual in the 2012-2013 budget." (Id. ¶ 80). None of this alleged conduct, however, permits a reasonable inference that defendants Howell and Knight joined in the conspiracy with the other defendants to fabricate and conceal evidence of plaintiff's credit card expenditures before the grand jury. Notably, it is not alleged that they were present during alleged discussions in which the other defendants allegedly decided to have defendant Chapman state that there were not any receipts or documentation supporting plaintiff's credit card expenditures as charged in the indictment.

In sum plaintiff has not stated a claim against defendants McLeod, Kight, or Howell, for causing a § 1983 violation or § 1983 conspiracy. In this part, plaintiff's motion to amend is denied. As noted above, plaintiff has stated a claim against defendants Chapman, Wood, Holloman, Hammond, Edmundson, and Long, for causing a § 1983 violation and for § 1983 conspiracy. In this part, the motion amend is granted.

d.    Section 1985 Conspiracy – Equal Protection

Section 1985(2) provides a private right of action for damages "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws." 42 U.S.C. § 1985(2).   Section 1985(3) similarly provides a private right of action for damages "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).

"The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."  Kush v. Rutledge, 460 U.S. 719, 726 (1983); see Gooden v. Howard Cty., Md., 954 F.2d 960, 970 (4th Cir. 1992) (en banc); Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir. 1985) (noting that an essential element of such claim is that defendants were "motivated by a specific class-based, invidiously discriminatory animus").

 The "'invidiously discriminatory animus' requirement . . . requires that the defendant have taken his action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 275-76, (1993) (emphasis added) (internal quotations omitted).   Further, "invidious" in this context means "[t]ending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating."  Id. at 274 (quotations omitted).

Plaintiff's § 1985 conspiracy claim fails as a matter of law because she has not alleged that defendants were motivated by invidiously discriminatory animus.  Plaintiff suggests she has

sufficiently pleaded racial animus on the basis of the October 29, 2012, email from defendant Long to McNeill. (Prop. Am. Compl. ¶ 169). This court previously addressed this email as a basis for plaintiff's § 1985 claim, and determined that it is an insufficient factual basis for this claim. (See DE 93 at 29-30). Plaintiff has not alleged any new facts other than this email permitting a reasonable inference of discriminatory animus. While plaintiff has asserted additional legal commentary in the proposed amended complaint, this legal commentary fails to take into account pleading requirements needed to overcome qualified immunity. See Gooden, 954 F.2d at 969.

Accordingly, plaintiff fails to state a claim for § 1985 conspiracy, and the motion to amend must in this part be denied.

3.      Motion to Dismiss by Defendant Wood

Defendant Wood moves to dismiss count four of the original complaint, a § 1983 claim based on false public statements. Where the court allows plaintiffs to file an amended complaint, and where the amended complaint does not include a claim against defendant Wood based upon false public statements, defendant Wood's motion to dismiss is denied as moot.

**CONCLUSION**

Based on the foregoing, plaintiffs' motion to amend (DE 101) is GRANTED IN PART and DENIED IN PART as set forth herein. In summary, plaintiff Everette-Oates is allowed to proceed on the following claims:

1)      Concealment of Evidence and Seizure § 1983 (count two) against defendant Chapman;

2)      Fabrication of Evidence and Seizure § 1983 (count three) against defendant Chapman; and

3)      Civil Conspiracy and Causing § 1983 violation (count four) against defendants Chapman, Wood, Holloman, Hammond, Edmundson, and Long.

Plaintiff's remaining claims for malicious prosecution (count one) and denial of equal protection (counts five and six), as well as all claims against defendants McLeod, Knight, and Howell, are DISMISSED as futile for failure to state a claim. Plaintiff is DIRECTED to file within **14 days** of the date of this order an amended complaint setting forth only those claims and defendants remaining in accordance with the instant order. Plaintiff must serve her first amended complaint on Chapman, Wood, Holloman, Hammond, Edmundson, and Long, and these defendants must respond within **14 days** after service of the first amended complaint. In addition, defendant Wood's motion to dismiss (DE 104) is DENIED AS MOOT.

SO ORDERED, this the 23rd day of May, 2017.


LOUISE W. FLANAGAN
United States District Judge