IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CV-623-FL

<table>
<tr><td>PRISCILLA EVERETTE-OATES,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>LOLITA CHAPMAN In Her Individual</td><td>)</td><td>ORDER</td></tr>
<tr><td>Capacity; BETH WOOD In her Individual</td><td>)</td><td></td></tr>
<tr><td>Capacity; T. VANCE HOLLOMAN In his</td><td>)</td><td></td></tr>
<tr><td>Individual Capacity; ROBIN HAMMOND</td><td>)</td><td></td></tr>
<tr><td>In her Individual Capacity; and SHARON</td><td>)</td><td></td></tr>
<tr><td>EDMUNDSON In her Individual Capacity,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
</table>

This matter is before the court on the parties' cross motions for summary judgment (DE 175, 178, 184, 189). These motions have been briefed fully, and the issues raised are ripe for ruling. For the following reasons, defendants' summary judgment motions are granted and plaintiff's summary judgment motion is denied.[1]

## STATEMENT OF THE CASE

Plaintiff, along with former-plaintiff Duarthur Oates, commenced this action on November 10, 2015, in the United States District Court for the Western District of North Carolina, asserting federal constitutional claims and state common law tort claims against defendants who are current and former state government officials, arising out of an investigation, indictment, and prosecution of plaintiff while she was mayor of the Town of Princeville, North Carolina (the "Town").

---

[1] In addition, plaintiff filed an unopposed motion (DE 194) for leave to file an amended memorandum and statement of undisputed material facts, which motion is granted on the terms set forth herein.

On September 28, 2016, the court dismissed without prejudice all claims, except for one claim against defendant Beth Wood ("Wood") in her individual capacity (false public statements and seizure, under 42 U.S.C. § 1983). Upon plaintiff's motion construed as a motion to amend complaint, the court on May 23, 2017, allowed plaintiff to file an amended complaint with only certain claims as proposed by plaintiff but not others. In particular, the court allowed plaintiff to proceed on the following claims:

1) Concealment of evidence and seizure under § 1983 (count two) against defendant Lolita Chapman ("Chapman");

2) Fabrication of evidence and seizure under § 1983 (count three) against defendant Chapman; and

3) Civil conspiracy and causing a § 1983 violation (count four) against defendants Chapman, Wood, T. Vance Holloman ("Holloman"), Robin Hammond ("Hammond"), and Sharon Edmundson ("Edmundson"), and former defendant Barry Long ("Long"), in their individual capacities.

Plaintiff's other proposed claims for malicious prosecution (count one) and denial of equal protection (counts five and six), as well as all claims against former-defendants Gregory McLeod, Gwendolyn Knight ("Knight"), and Ann Howell ("Howell"), were dismissed as futile for failure to state a claim. Plaintiff filed a first amended complaint on June 5, 2017, largely in accord with the court's May 23, 2017 order, but with certain portions foreclosed by the court's order and/or subject to challenge by defendants in motions to dismiss and motions to strike. On October 31, 2017, the court dismissed claims against former defendant Long as time barred, and the court confirmed the remaining claims and defendants as those claims set forth above and those defendants set forth in the caption of this order.

Following an extended period of discovery, and in accordance with the court's case management order, the parties filed the instant motions for summary judgment on April 1, 2019.

In support of her summary judgment motion, plaintiff relies upon a memorandum of law, statement of material facts,[2] supplemental statement of facts, as well as appendix and a supplemental appendix, with accompanying exhibits, including declarations by 1) plaintiff (attaching exhibits including email correspondence and statement by plaintiff), 2) plaintiff's counsel, 3) former Town attorney Charles D. Watts, Jr. ("Watts"), 4) a prosecuting attorney in plaintiff's prosecution, Tonya Montanye ("Montanye") (attaching exhibits including correspondence), 5) consultants Wallace Green and Reginald 'Reggie' K. Smith ("Smith"), 6) former Town police chief Joey Petaway, 7) former Town commissioners, Isabelle P. Andrews ("Andrews"), Calvin Sherrod ("Sherrod"), and Maggie Boyd, and former town clerk, Daisy Staton.

In addition, plaintiff relies upon 1) excerpts of depositions of plaintiff; each defendant; former defendant Long; Montanye and prosecutor Scott Harkey ("Harkey"); and plaintiff's counsel in criminal proceedings Joseph Hester and Malvern King; 2) selected deposition exhibits included among the following documents; 3) Office of the State Auditor ("OSA") and State Bureau of Investigation ("SBI") interview memoranda; 4) emails and written correspondence between defendants, plaintiff, plaintiff's counsel, accountants, prosecutors, Town officers, and officials of OSA and SBI and other government officials; 5) copies of files maintained by defendant Hammond with attachments; 6) OSA Investigative Report, dated April 8, 2013 ("OSA audit report"), and Re-Released Investigative Report, dated December 2014; 7) a March 27, 2013

---

[2] Plaintiff also relies upon a proposed amended memorandum of law and amended statement of undisputed facts, correcting two inadvertent errors in citations and numbering in the statement of undisputed facts. Plaintiff moves for leave to file an amended memorandum and statement of undisputed material facts, which motion is unopposed. The court notes that defendant's opposition to plaintiff's statement of material facts, cited herein, corresponds to plaintiff's amended statement of undisputed facts. For good cause shown, plaintiff's motion for leave (DE 194) is GRANTED, and plaintiff's amended memorandum (DE 194-1) and statement of facts (DE 194-2) are deemed filed.

"Response" to draft OSA audit report, prepared by Watts; 8) orders and notices in plaintiff's criminal case, 13 CRS 2056; 9) a draft indictment with notes; 10) Town resolutions, notices, and agreements; 11) photographs of file boxes and file contents; 12) reports and other documents referencing economic development in the Town; and 13) SBI policy and procedure manual, dated May 1, 2008.

In support of her motion, defendant Chapman relies upon a memorandum of law, statement of material facts, and the following documents: 1) additional deposition excerpts, 2) additional SBI interview memoranda, 3) indictment of plaintiff, and 4) plaintiff's interrogatory responses.

In support of her motion, defendant Wood relies upon a memorandum of law, statement of material facts, and the following documents in addition to those previously described: 1) additional deposition excerpts, 2) interrogatory responses, 3) correspondence between defendant Edmundson and Town officials, 4) OSA interview memoranda, 5) April 23, 2012, independent auditors' report by Petway Mills & Pearson, PA; 6) and declaration of accountant, Phyllis M. Pearson ("Pearson").

In support of their motion, defendants Holloman, Hammond, and Edmundson, rely upon a memorandum of law, statement of material facts, and the following documents in addition to those previously described: 1) additional deposition excerpts; 2) declarations of Holloman, Edmundson, and Hammond, with exhibits including correspondence, resolutions, and other work product of the Local Government Commission ("LGC") and its staff; 3) additional OSA and SBI interview and file memoranda; 4) additional correspondence between LGC officers, plaintiff, and Town officers; 5) Long affidavit; 6) additional documents filed in plaintiff's criminal case; and 7) additional interrogatory responses.

In their April 22, 2019, oppositions to plaintiff's motion, defendants rely upon memoranda of law, an opposing statement of facts, as well as a joint appendix containing the following: 1)

additional deposition excerpts 2) additional correspondence and interview memoranda; and 3) additional copies of Town receipts, correspondence, and account statements.

In her April 22, 2019, opposition to defendant Holloman, Hammond, and Edmundson's motion, plaintiff relies upon a memorandum of law, an opposing statement of facts, and objections to evidence submitted. In her opposition to defendant Chapman's motion, plaintiff relies upon a memorandum of law, and an opposing statement of facts. In her opposition to defendant Wood's motion, plaintiff relies upon a memorandum of law, an opposing statement of facts, and objections to evidence submitted. Plaintiff also filed on April 23, 2019, a supplemental statement of material facts, and a supplemental appendix, including additional deposition excerpts and exhibits from depositions.

On May 6, 2019, defendants filed a joint response in opposition to plaintiff's evidentiary objections, relying upon affidavits of OSA and SBI officials, Timothy J. Hoegemeyer and Nathaniel L. McLean. That same date, plaintiff filed a reply in support of her summary judgment motion.

## STATEMENT OF UNDISPUTED FACTS

The undisputed facts may be summarized as follows.

Plaintiff served two terms as the mayor of the Town, first between 2003 and 2005, and second between January 2010 and December 2013. (Pl's Opp. Stmt. (DE 200) ¶ 1).[3]

The Local Government Commission ("LGC") is a legislatively created state commission that has the duties and authority set out in the North Carolina Local Government Finance Act, N.C. Gen. Stat. §§ 159-1 to 159-216, including responsibility for approving local government debt, and for monitoring the fiscal and accounting practices of local governments. (Id. ¶¶ 3, 6). The LGC

---

[3] Where a fact asserted in a party's statement of material facts is undisputed, the court cites to the opposing party's responsive statement of facts, where it indicates the fact is admitted or undisputed or without opposing fact.

has the authority to impound the books and records and assume financial control of any local government that defaults or is expected to default on a debt or that fails to comply with the Local Government Finance Act. (Id.). The LGC consists of nine members, including the State Treasurer, the State Auditor, who is defendant Wood, and the Secretary of Revenue, who each serve as ex officio members. (Id. ¶ 4).

The LGC operates as a division of the Department of State Treasurer ("DST"), and the staff of the LGC is provided by the Fiscal Management Section of the State and Local Government Finance Division of the DST (the "LGC staff"). (Id. ¶ 5). In the event that the LGC votes to assume temporary financial control of a local government, the LGC staff is responsible for maintaining the day-to-day control of the finances of the local government. (Id. ¶ 8). The director of the Fiscal Management Section serves as the finance and budget officer of the local government during the period of assumed financial control. (Id.).

Three defendants in this case worked for DST. Defendant Holloman, who is a certified public accountant, worked for the DST from 1985 until his retirement in 2015, including from 2006 until retirement in position of deputy state treasurer and director of the State and Local Government Finance Division. (Id. ¶¶ 9-11). Defendant Edmundson, who is a certified public accountant, has worked for DST since 2002, and has held the position of director of the Fiscal Management Section since 2006. (Id. ¶ 16). Defendant Hammond worked for DST from May 2012 until her retirement in 2017, serving as assistant general counsel, assigned to serve as legal counsel to the State and Local Government Finance Division and LGC. (Id. ¶¶ 18-21).

The North Carolina Office of State Auditor ("OSA") is an agency of the state, responsible, in part, for conducting audits of all state agencies, and entities supported, partially or entirely, by public funds. (Id. ¶ 22). Defendant Wood, as state auditor, is authorized and directed to make any

comments, suggestions, or recommendations she deems appropriate concerning any aspect of an audited entity's activities and operations. (Id. ¶ 23).

The North Carolina State Bureau of Investigation ("SBI") is a state criminal law agency set up for the identification of criminals, for their apprehension, and investigation and preparation of evidence to be used in criminal courts. (Id. ¶ 26). Defendant Chapman was an SBI field agent from 2007 until 2014, assigned to conduct criminal investigations. (Id. ¶ 27). In 2014, she became a special agent with the Medicaid Investigations Division of the North Carolina Department of Justice. (Id.).

The Town has experienced financial difficulties, which have been exacerbated by severe flooding caused by several hurricanes. (Id. ¶ 28). As a result of these financial difficulties, the LGC has twice voted to assume financial control of the town. (Id.). The first time was in 1997; the second time was in 2012. (Id.). Princeville is the only town where the LGC has had to assume financial control more than once. (Id.).

Beginning in 2010 and up until July 2012, when the LGC voted to assume control of the Town's finances, the LGC staff corresponded and interacted frequently with Town officials about the financial condition of the town. (Id. ¶ 29). In 2012, prior to the LGC vote, DST staff prepared a chart summarizing the correspondence and interactions that LGC staff had with town officials about the town's financial condition. (Id.). This chart was prepared by DST staff leading up to the recommendation from the LGC staff that the LGC vote to assume financial control of the Town. (Id.).

On April 23, 2012, the Town received an independent audit for the fiscal year ending June 30, 2011 (the "2010-2011 audit"), conducted by the accounting firm Petway Mills & Pearson, PA, under the direction of Pearson (the "independent auditor"). (Id. ¶¶ 30-31). In the 2010-2011 audit,

the independent auditor was unable to verify the accuracy of the Town's financial statements due to inconsistencies and errors in the accounting records and due to a lack of internal controls over the Town's financial operations. (Id. ¶¶ 31). Based on this, the independent auditor issued an adverse opinion on the Town's financial statements. (Id.). This means that the financial statements did not present fairly or in conformity with generally accepted accounting principles the financial position of the Town. (Id.). In addition, the independent auditor identified 19 material weaknesses in the Town's internal controls over its financial reporting. (Id.).

Among the identified material weaknesses were inadequate internal controls to ensure that transactions were properly documented and properly approved. (Id. ¶ 32). The independent auditor identified $23,496 in expenditures that were not supported by complete or adequate documentation. (Id.). This included incomplete or inadequate documentation to show that some credit card charges and other expenditures were for a legitimate business purpose. (Id.).

> Under generally accepted government accounting and auditing principles, to verify that a charge or expenditure is for a legitimate business purpose the charge or expenditure must be properly documented. Proper documentation for a credit card expenditure related to town business would include documentation explaining the purpose of the expenditure and why it was necessary for town business purposes. For example, proper support for a travel expenditure charged to a town credit card would include a travel reimbursement form explaining the business purpose of the travel and would also including other supporting documentation such as a conference or meeting agenda. Under generally accepted government accounting and auditing principles, itemized receipts are necessary but not sufficient documentation for town expenditures. While itemized receipts show that expenditure was made, they do not show that the expenditure was made for a legitimate business purpose. Similarly, general statements that expenditure was for town business or for a meeting are also inadequate to show that the expenditure was made for a legitimate business purpose. A statement supporting business expenditure should explain the purpose of the expenditure and why it was necessary for town business purposes and should be supported by additional documentation.

(Id. ¶¶ 33-34).

On July 30, 2012, the LGC voted to assume financial control of the Town and to impound the Town's financial records. (Id. ¶ 36). Defendant Edmundson, as Director of the Fiscal

Management Section, was appointed by the LGC as the finance officer for the Town. (Id. ¶ 37). LGC staff removed some of the Town's original financial records to its offices in Raleigh. (Id. ¶ 42). There was no inventory or log of the Town's financial records that were brought back to the LGC. (Id. ¶ 43). The records were stored in several different locations in the LGC offices, including a cubicle, a small file room, and in offices. (Id. ¶ 44). Edmundson had responsibility for the Town records in the LGC offices. (Id. ¶ 44). The records were accessed by LGC staff as needed and Edmundson trusted her staff to keep the records organized if possible. (Id.). Holloman, Edmundson, and the LGC had sole custody of the records, and the records remained in LGC offices at all times while LGC had custody of them. (Defs' Opp. Stmt. (DE 196) ¶¶ 58-59). Edmundson kept records in her office that she was "accessing at least initially on a regular . . . basis." (Id. ¶ 60; Edmundson Dep. 74).[4]

Defendant Wood, as a member of the LGC, became aware of the financial problems in the Town, and she was present at the July 30, 2012, LGC meeting when the LGC voted to take over the Town's finances. (Pl's Opp. Stmt. (DE 200) ¶¶ 55-56). At the meeting, plaintiff gave to defendant Wood documents that plaintiff alleged were evidence of the misallocation of Federal Emergency Management Agency ("FEMA") funds, meant for the use of the Town and its residents after Hurricane Floyd in 1999, to individuals or businesses that were not entitled to the funds. (Id. ¶ 58). At the conclusion of the meeting, defendant Wood overheard plaintiff talking to another LGC member about a fifty thousand dollar check that no one was looking into. (Id. ¶ 57). Defendant Wood took the information she received from plaintiff back to her office and gave it to David King, OSA's Director of Investigations, to investigate plaintiff's allegations of

---

[4] Where there are multiple copies of deposition excerpts in the court's file, citations to page numbers of deposition transcripts correspond to the page showing on the face of the underlying transcript, and not the page number designated by the court's case management and electronic case filing (CM/ECF) system.

misappropriated FEMA funds. (Id. ¶ 59).   Defendant Wood initiated an OSA investigation into Princeville's finances by passing on to David King the information she learned at the meeting, who in turn passed that information on to former defendant Long, who is an Investigative Supervisor with the OSA. (Id. ¶¶ 60-61).  Based on interviews of SBI agents, Long learned that the SBI had already investigated plaintiff's allegations.  (Id. ¶ 63).[5]

Plaintiff also had made complaints directly to defendant Holloman that the Town's FEMA funds had been embezzled, including a complaint about a fifty thousand dollar check made payable to commissioner Howell and checks written to commissioner Knight. (Defs' Opp. Stmt. (DE 196) ¶¶ 10, 11).  Plaintiff requested an accounting of all FEMA funds that had gone to the Town.  (Id.).

On September 19, 2012, defendant Edmundson sent a letter to plaintiff and the Town commissioners about the several areas of concern that the LGC staff had with the Town's finances. (Pl's Opp. Stmt. (DE 200) ¶¶ 46-47).  This letter also included an attached schedule of charges to the town credit card account. (Id.).  One of the issues raised in the letter was an alleged lack of documentation to show that charges on the town credit card were for legitimate town business and were authorized in the Town's budget.  (Id.).  Defendant Edmundson sent plaintiff and the Town commissioners a revised the schedule of charges with alleged lack of documentation on October 31, 2012.  (Id. ¶ 48).

OSA investigators Long, Bryan Matthews ("Matthews"), and David King interviewed LGC staff members defendants Holloman and Edmundson, with Hammond present, on October 8, 2012 at the LGC's offices regarding the LGC's takeover of the Town's finances and information concerning allegations of fraud, waste and abuse.  (Id. ¶ 65).

---

[5] The court addresses in the analysis herein plaintiff's evidentiary objections to OSA interview memoranda.

On October 23, 2012, OSA investigators David King, Long, and Matthews interviewed accountant Pearson regarding financial audits she performed for the Town of Princeville. (Id. ¶ 68). That same date, OSA investigators interviewed East and Pappas and created a memorandum of interview stating "Mr. East suggested that we meet with the Edgecomb [sic] County District Attorney to apprise him/her of what we're planning to do in Princeville." (DE 187-12 at 3)).[6]

On October 29, 2012, Long requested by email "an African-American Agent" from SBI supervisor Cheryl McNeill ("McNeill"), with copy to his supervisor, David King. (Defs' Opp. Stmt. (DE 196) ¶¶ 37). At the time, Long had no evidence that plaintiff had committed a crime. (Id. ¶ 38). On October 30, 2012, McNeill sent a letter to Long stating that she was assigning defendant Chapman to the OSA investigation. (Pl's Opp. Stmt. (DE 200) ¶ 72). Sometime after October 30, 2012, in late 2012, Long met with defendant Chapman. (Defs' Opp. Stmt. (DE 196) ¶ 37).

On November 19, 2012, OSA investigators Long and Kevin Thomas ("Thomas") met with Edgecombe County district attorney Robert A. Evans ("Evans"), assistant district attorney Steve Graham, and defendant Chapman to discuss plaintiff's allegations of misappropriated FEMA funds. (Pl's Opp. Stmt. (DE 200) ¶ 74). Aspects of the OSA's investigation of the Town's finances, including aspects thereof specific to plaintiff, were not discussed at this meeting. (Id.). On November 29, 2012, OSA investigators Long, Matthews, and Thomas met with SBI Special Agent Pappas to discuss Plaintiff's allegations of misappropriated FEMA funds. (Id. ¶ 75). At this meeting, the OSA investigators learned details of the SBI's investigation of Plaintiff's allegations

---

[6] Citations to page numbers of documents in the record designated by a docket entry ("DE") number correspond to the page number designated by the court's CM/ECF system, and not the page showing on the face of the underlying document, if any.

and the outcome of that investigation. (Id.). No discussion of other aspects of the OSA's investigation, including any relating to plaintiff, took place at this meeting. (Id.).

On December 10, 2012, OSA investigators Long and Matthews met with Smith, who provided statements about his work as a consultant to the Town. (Id. ¶ 76). On January 7, 2013, OSA investigators Long and Matthews met with Victor Marrow, who provided information regarding his work as former Town Manager. (Id. ¶ 77). On January 10, 2013, OSA investigators Long and Matthews met with Diana Draughn ("Draughn"), who provided information regarding her work as former Town Finance Officer. (Id. ¶ 78). In a follow up call, on February 13, 2013, Draughn provided further information regarding her work as former Town Finance Officer. (Id. ¶ 79). On February 19, 2013, OSA investigators Long and Matthews met with Edmundson, who provided information about the LGC's takeover of the Town's finances. (Id. ¶ 80).

The OSA published an "Investigative Report Town of Princeville" on April 27, 2013 (the "OSA audit report"). (Def's App. Ex. 24). The OSA audit report set forth three findings: 1) that plaintiff and a town employee used town credit cards for questionable expenses, 2) that plaintiff, a Town commissioner, and the interim town manager received check reimbursements of $4,112 for travel expenses without adequate supporting documentation, and 3) that plaintiff entered into contracts without obtaining the required pre-audit or board approval. (Id. pp. 7-12). For the first two findings, the OSA audit report noted that OSA referred the findings to the SBI, Edgecombe County district attorney, the Internal Revenue Service, and the state Department of Revenue. (Id. pp. 9-10).

On March 13, 2013, OSA provided a draft copy of the OSA audit report to the Town, and requested a single response by the Town by March 27, 2013. (Defs' Opp. Stmt. (DE 196) ¶¶ 75-76)). LGC also received the draft copy, and upon receipt LGC recommended that Town attorney,

Watts, prepare the Town's response to the OSA audit report. (Id. ¶ 80). Watts negotiated an arrangement for payment through the LGC and counsel to the LGC, and reached agreement for Watts to do the work at a substantial discount and to attend a Town board meeting to get approval to do the work. (Id.). Watts prepared a draft response to the draft OSA audit report. (Id. ¶ 85). Hammond understood that the Town board did not like the response that Watts had prepared. (Id. ¶ 95). During a March 28, 2013 meeting, Town commissioners Knight, Howell and Sherrod voted to approve the OSA audit report without Watts' response, despite having voted to approve Watts drafting a response, and after Watts provided a draft of his response to Howell on March 27, 2013. (Id. ¶ 96).

On April 18, 2013, Long provided defendant Chapman with a copy of a draft of the OSA audit report, which was the same in substance to the final OSA audit report published on April 27, 2013. (Pl's Opp. Stmt. (DE 200) ¶ 82). Also on April 18, 2013, Chapman, together with Long, met with Edgecombe County district attorney Evans. (Id. ¶ 83). At that meeting, Evans requested that the SBI conduct an investigation concerning the findings in the OSA audit report. (Id.). Defendant Chapman was the SBI agent assigned to the investigation. (Id. ¶ 84). Montanye, who was a financial crimes prosecutor, was the lead prosecutor in Plaintiff's criminal case. (Id. ¶ 85).

On May 7, 2013, Long gave to defendant Chapman a "copy of the travel expense reports for the Town of Princeville Mayor . . . concerning this investigation." (Defs' Opp. Stmt. (DE 196) ¶ 103); DE 187-30; Long Dep. 206-208). On May 21, 2013, defendant Chapman received from plaintiff's attorney, Malvern King, a letter outlining plaintiff's explanation for the credit card charges subject of the OSA audit report, including the draft response of Watts, and provided it to Montanye. (Defs' Opp. Stmt. (DE 196) ¶¶ 283, 289). Chapman received and copied for her file and the prosecution documents recorded in an SBI file memorandum referencing "Reginald

Smith's Work Product" (Defs' Opp. Stmt. (DE 196) ¶ 304; DE 187-31). Town commissioner Andrews provided Chapman with a series of affidavits regarding the Economic Development Committee and that town files were missing. (Defs' Opp. Stmt. (DE 196) ¶ 306; DE 191-44 at 3-4).

Two issues in the case identified by prosecutor were the existence of receipts and whether an Economic Development Committee existed. (Pl's Opp. Stmt. (DE 200) ¶ 89; see Defs' Opp. Stmt. (DE 196) ¶ 124). Between the two issues, the existence of an Economic Development Committee was the more significant to them. (Id.).

Montanye created a draft indictment for a meeting she had with Evans. (Pl's Opp. Stmt. (DE 200) ¶ 93). The draft indictment shows the purpose for each of the included charges as "Economic Development Commission." (Id.; see DE 191-30). For some of the charges it indicates that a receipt was provided and for others it indicates that no receipt was provided. (Id.). "Based on this, Montanye testified: 'See, as you can tell, it didn't really make a difference whether a receipt was provided or not . . . .'" (Id. (quoting Montanye Dep. 56)). The prosecutors brought charges for some transaction where receipts were provided if they were related to the Economic Development Committee. (Defs' Opp. Stmt. (DE 196) ¶ 125).

Edmundson had conversations with Montanye and defendant Chapman regarding the indictment that specifically referenced the credit card charges and lack of documentation. (Id. ¶ 121). Edmundson specifically discussed with Montanye a schedule of receipts that Edmundson prepared, that included the credit card charges that were the basis of the indictment. (Id. ¶ 122). The prosecuting attorneys reviewed the allegations they intended to include in the indictment in meetings with defendants Chapman, Edmundson, Holloman, Hammond, and district attorney Evans. (Id. ¶ 129).

Defendant Chapman relied on her file and documents from Montanye for Chapman's grand jury testimony. (Id. ¶ 305). On August 5, 2013, defendant Chapman testified before a grand jury in plaintiff's criminal case. (Pl's Opp. Stmt. (DE 200) ¶ 96). Chapman was the only witness to testify to the grand jury. (Id.). Plaintiff was indicted by the grand jury on August 5, 2013. (Id. ¶ 97; see DE 191-33 at 4-8 ). After the indictment, Chapman arrested plaintiff and she was released on bond. (Def's Opp. Stmt. (DE 196) ¶ 261).

After Plaintiff's indictment, her attorneys sent a subpoena for documents and a public records request to the LGC seeking records related to the charges against Plaintiff. (Pl's Opp. Stmt. (DE 200) ¶ 98). In September 2014, the court denied the LGC's and DST's motions to quash and ordered that plaintiff's criminal defense counsel and the prosecution be allowed to go on site at the LGC offices to inspect the Town documents that were there. (Id. ¶ 102). Plaintiff's attorney, Ryan Stump, as well as prosecutors Montanye and Harkey, came to the LGC office to inspect the records. (Id.). These attorneys were at the office for two days examining the records. (Id.). The LGC staff had put most of the Princeville files in one storage room to be reviewed by the attorneys. (Id.). Edmundson also had some Town files in her office. (Id.). Edmundson invited the attorneys to come in and look at the Town files in her office. (Id.).

In Edmundson's office, the attorneys found receipts for some of plaintiff's credit card expenditures that they had not previously seen. (Id. ¶ 103). A folder containing Town economic development materials was also found at the LGC offices. (Id.). If Edmundson had not invited the attorneys into her office, the credit card receipt documentation may never have been discovered. (Id. ¶ 104). The receipts that were discovered in Edmundson's office were put in a sealed envelope and picked up later by Chapman. (Id. ¶ 105).

Following the site visit, defendant Hammond estimated that the number of documents that the LGC had in their exclusive possession that would need to be copied at 35,000-50,000 pages of documents. (Defs' Opp. Stmt. (DE 196) ¶ 190).

The OSA revised and reissued its OSA audit report in December 2014. (See DE 191-25). In the revised audit report, the OSA stated that plaintiff had credit card charges that were not adequately documented in the amount of $5,408.20, down from $8,114.76 that was stated in the original OSA audit report. (Id.).

After the discovery of the documents at LGC offices, Montanye recommended to Evans that the charges against plaintiff should be dismissed. (Pl's Opp. Stmt. (DE 200) ¶ 107). The criminal charges against the Plaintiff were ultimately dismissed on March 18, 2015. (Id. ¶ 108). The LGC returned financial control to the Town of Princeville on August 4, 2015. (Id. ¶ 53).

Additional facts will be discussed in the analysis herein.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes

between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.    Analysis

1.    Claims for Concealment and Fabrication of Evidence by Defendant Chapman

Plaintiff's first and second claims remaining for adjudication are based upon alleged concealment and fabrication of evidence by defendant Chapman in testimony before the grand jury. (See Am. Comp. (DE 122) ¶¶ 129-143; Order (DE 121) at 22). Defendant Chapman asserts, among other grounds for summary judgment, that she is absolutely immune from liability under §1983 for all claims based upon her testimony before the grand jury. Because this issue potentially is determinative of these claims, the court addresses it first.

"The factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses." Rehberg v. Paulk, 566 U.S. 356, 367 (2012). Accordingly, the United States Supreme Court has held that "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony." Id. at 369. "In addition, . . . this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." Id.

"Were it otherwise, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." Id. "In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony." Id. at 369-70. Accordingly, such preparatory activity also is covered by absolute immunity. See id. at 370.

By contrast, this does not mean "that absolute immunity extends to all activity that a witness conducts outside of the grand jury room." Id. at 370 n.1 (emphasis in original). For

18

example, the Supreme Court has "accorded only qualified immunity to law enforcement officials who falsify affidavits and fabricate evidence concerning an unsolved crime." Id. (citations omitted). The United States Court of Appeals for the Fourth Circuit also has recognized that "[n]otwithstanding the conclusive effect of . . . indictments, our precedents instruct that a grand jury's decision to indict will not shield a police officer who deliberately supplied misleading information that influenced the decision." Durham v. Horner, 690 F.3d 183, 189 (4th Cir. 2012) (quotations omitted).

Plaintiff's claims against defendant Chapman fall squarely within the absolute immunity bar set forth in Rehberg. See 566 U.S. at 367. Her claims against defendant chapman are based on the assertion that defendant Chapman "recklessly failed to show to the grand jury" documentation of credit card charges by plaintiff, as well as a folder containing documents pertaining to the "Princeville Comprehensive Economic Development Plan." (Am. Compl. (DE 122) ¶ 129). She asserts that defendant Chapman, "made materially false statements and omissions during her testimony to the grand jury." (Id.). She also asserts that defendant Chapman "testified in front of the grand jury" contrary to information provided by Montanye, (id. ¶ 133), and failed "to inform the grand jury of facts she knew would negate probable cause for the indictment." (Id. ¶ 135).

Likewise, in her briefs, plaintiff asserts that defendant Chapman "did not provide any testimony regarding the existence of the [Economic Development Committee] to the grand jury," and "intentionally mislead prosecutors and the Grand Jury and concealed exculpatory evidence" as to the existence of corroborating receipts and the economic development committee. (Pl's Resp. (DE 204) at 12, 16-17). She asserts, that "without Defendant Chapman stating that receipts were either not turned in or were not for a legitimate business purpose . . . there would have been no evidence upon which the grand jury could have returned a true bill of indictment." (Reply (DE

216) at 5. In addition, she asserts, "[s]ince [d]efendant Chapman concealed the evidence from the prosecutors, it can be inferred that she concealed it from the grand jury." (Pl's Resp. (DE 204) at 17). Further, she asserts that defendant Chapman "fabricated evidence when she falsely told the prosecutors and the grand jury that the [Economic Development Committee] did not exist and that there was no evidence regarding the [Economic Development Committee]." (Id. at 19).

Plaintiff's claims based on these assertions against defendant Chapman are barred by absolute immunity, because they are "based on the witness' testimony" to the grand jury, and upon "preliminary discussion in which the witness relates the substance of [her] intended testimony" to prosecutors. Rehberg, 566 U.S. at 367. Indeed, plaintiff does not address defendant Chapman's assertion of absolute immunity in response to summary judgment. Therefore, plaintiff's claims against defendant Chapman must be dismissed on the basis of absolute immunity.

Plaintiff suggests, nonetheless, that she may be able to advance a claim against defendant Chapman on the basis of conduct and communications made by defendant Chapman prior to and apart from her grand jury testimony and discussions with prosecutors.[7] To the extent there is a basis for such a claim outside the veil of absolute immunity in this case, plaintiff has not brought forth evidence permitting an inference that defendant Chapman "deliberately supplied misleading information," intentionally made false statements, or "fabricate[d] evidence" for presentation to the grand jury. Durham, 690 F.3d at 189; Rehberg, 566 U.S. at 370 n.1.

For example, plaintiff asserts that "Montanye relied on Chapman's representation that Chapman was unable to produce any evidence of the existence of the EDC [Economic

---

[7] The court's May 23, 2017 order allowing plaintiff to amend her complaint in part allowed plaintiff to proceed with a claim against defendant Chapman for concealment and fabrication of evidence, without addressing absolute immunity under Rehberg. (See DE 121 at 19-23). Defendant Chapman, however, did not raise absolute immunity in moving to dismiss claims against her under Federal Rule of Civil Procedure 12(b)(6). (See, e.g., DE 39). Defendant Chapman asserted defenses of immunities generally in her answer. (DE 147).

Development Committee]." (Resp. (DE 204) at 16). Plaintiff's assertion is not supported by the evidence in the record, and it is insufficient to show deliberately false or misleading statement on the part of defendant Chapman. It is undisputed that Chapman provided her SBI investigative file to the prosecution prior to her grand jury testimony. (DE 191-48; Montanye Dep. 33, 154, 159-165; Montanye email, dated May 30, 2013 re: "Your report" (DE 187-63)). Contained within this SBI investigative file were numerous memoranda of interviews and documents collected pertaining to the existence of the Economic Development Committee for the Town, all on their face copied to district attorney Evans prior to the indictment, including, but not limited to, the following exemplary excerpts:

1) May 7, 2013, SBI file memorandum attaching: a) "copy of the travel expense reports for the Town of Princeville Mayor . . . concerning this investigation." (Defs' Opp. Stmt. DE 187-30). According to testimony describing these expense reports, one is "signed by Ms. Oates 8-2-10, and then it's approved by officer - - it appears to be Diana Draughn 8-23-10." (Long Dep. 209). "That would indicate that someone has reviewed any documentation and approved the expenses for reimbursement."

2) May 21, 2013, SBI file memorandum attaching: a) "A COPY OF A LETTER FROM ATTORNEY MALVERN F. KING JR. CONCERNING THIS INVESTIGATION" which letter included a spreadsheet listing "DETAILED EXPLANATION" for plaintiff's credit card charges, including multiple references to travel for "Economic Committee for discussion on Town Business" "Economic Committee meeting"; and b) a response by Watts, Town Attorney, to the OSA audit report, which plaintiff now asserts "refutes the allegations for wrongdoing." (Pl's Resp. (DE 204) at 20) (emphasis added).

3) June 6, 2013, SBI file memorandum titled "COPIES OF REGINALD SMITH'S WORK PRODUCT CONCERNING THIS INVESTIGATION," attaching documents including: a) Town "Economic Development Plan," referencing Town "Economic Development STRATEGIES" such as "Princeville Water Plant" and "Princeville Financial Institution" and "Projects Accomplished"; b) a "Sampling of Economic Development Progress Reports (answers the invoice question)" with "Economic Development Progress Items" showing a percentage of "Work Complete" and statements such as "New economic development contacts continuously made to support the work underway"; c) "Grants Writing Communications Memo"; and d) "Project Samples."  (DE 191-46) (emphasis added).

4) June 11, 2013, SBI interview memorandum of Town commissioner Andrews stating:

> Andrews stated the Economic Development Committee was formed by her and Mayor Oates in the Mayor's first term in 2004 . . . . Andrews advised the economic committee met to discuss about how to get a water plant, grocery store and bank to come to Princeville.  Andrews remarked that she has an implementation sheet to show the committee's vision for the town.  Andrews advised they met out of town for the economic committee meeting, so they would be able to talk and it could go smoothly.  Andrews explained that Commissioner Howell and Knight are very disrespectful, so that is why they met out of town and could not meet in town.  . . . . Andrews advised the committee met with a representative from the G.K. Butterfield office. . . . Smith is a consultant and he tried to get economic growth and they needed a person specialized in that field. . . . . Andrews advised that they checked with Marrow first to make sure that it was alright to set up meetings and he said that it was alright, it was in the budget.

(DE 191-44 at 3-4) (emphasis added).

5) June 10, 2013, SBI interview memorandum of Town commissioner Knight stating: "Knight advised based on her opinion, Oates always says that she went to an Economic Committee meeting with Smith to discuss about getting grants and she has never seen any product of any grants."  (DE 191-37 at 3) (emphasis added).

6) June 13, 2013, SBI interview memorandum of Town consultant, Smith, stating: "Smith stated Mayor Oates asked him . . . to help with the economic development of the town.

Smith remarked he gave Barry Long documents concerning his work.  Smith stated <u>he met with Victor Marrow, Commissioner Andrews, and Mayor Oates from the [Town] and there was not a written structure of the Economic Committee that he knew about</u>. . . . Smith indicated he was a consultant for the Town . . . <u>working on economic development work. Smith advised a meeting was set up for him at the Hilton in Greenville, North Carolina, to give an update on the economic development</u>."  (DE 191-45) (emphasis added).

7) June 18, 2013, SBI interview memorandum of former Town Manager, Victor Marrow ("Marrow")  stating: "Marrow related he has not heard of the Economic Committee. . . . Marrow remarked <u>he knew that there was a meeting to discuss economic development</u>, but he did not know that it was an official economic development meeting.  . . . Marrow stated Mayor Oates hired Smith from the adoption of a resolution.  Marrow looked for the minutes and any other documentation and he could not find anything about the resolution being approved . . . . <u>Marrow acknowledged that he went with Mayor Oates and Andrews to some meetings out of town and they discussed various projects concerning who was going to do the projects, a timeline, and funding</u>."  (DE 191-39) (emphasis added).

8) June 27, 2013, SBI interview memorandum of plaintiff stating:

Oates stated <u>the individuals on the Economic Development Committee are her, Reggie Smith, Victor Marrow, and Mayor Pro Tem Andrews</u>. . . . Oates explained that a resolution was passed in 2005 that the mayor could sign a contact [sic] up to $10,000 and she did this for Smith. . . . Oates remarked that <u>the Economic Committee gave all the commissioners a booklet in the commissioners' meeting. Oates explained who was present and what was discussed at [each] Economic Committee meeting that is documented on the credit card statement</u> . . . . Oates stated the reason why she did not have the <u>economic committee meeting</u> in Princeville was because Knight, Howell, and Perkins would disrupt the meeting if they found out they were having a meeting.

(DE 191-40 at 3-4) (emphasis added).

9) June 27, 2013, SBI file memorandum attaching affidavits received from Andrews, including the following statements:

I, Mayor Pro Tem Andrews do hereby swear and affirm that <u>Reggie Smith was a Consultant with the Town of Princeville Economic Development</u>. . . . I [contacted] the current Interim Town Clerk to get me a copy of Reggie Smith's contract. She stated that she didn't see any files on Reggie Smith. As I have stated to Agent Lolita Chapman on June 11, 2013, that all of Princeville's files has gone missing since LGC took over the Town's books and finances.

I, Mayor Pro Tem Andrews do hereby swear and affirm that <u>I was part of the Princeville Economic Development Committee</u>. <u>I did attend the majority of those meetings</u>. I have seen Mayor Oates paid and put receipts in a zip lock bag. I have seen Mayor Oates turned her receipts and documents in the majority of the time to the Former Town Clerk/Finance Officer.

(DE 187-67 at 4-5).

In this manner, all this information and documentation regarding the <u>existence</u> of the Economic Development Committee was set forth plainly and in the open by defendant Chapman as part of the SBI file that was contemporaneously copied to district attorney Evans and provided and available for Montayne for her own assessment. Such evidence precludes a determination that defendant Chapman deliberately fabricated or concealed, or intentionally misrepresented, to prosecutors evidence regarding the existence of an Economic Development Committee.

At the same time, defendant Chapman had information in her SBI file and supplied from the other defendants and their staff that was a sufficient basis to find probable cause that plaintiff had engaged in criminal offenses alleged in the indictment. As noted above, Marrow stated in reference to an Economic Development Committee that "he did not know that it was an official economic development meeting" and "he could not find anything about the resolution being approved" (DE 191-39). Former Town clerk Tara Lloyd ("Lloyd") "indicated the only committee that she ever knew the town to have was the planning board and she never heard of an Economic Committee." (DE 191-38 at 3). Town commissioner Howell "advised she does not know anything

about any Economic Committee; the committee was never approved and she does not know who is on the committee." (DE 191-27 at 3). Former Town Finance Officer Diana Draughn stated she "did not know anything about an Economic Committee" and "Draughn remembered Reggie Smith . . . and Smith was supposed to have been the grant writer. Draughn remarked she never saw any grants that Smith brought to the Town." (DE 191-31 at 3-4).

Thus, whether the Economic Development Committee existed or was authorized as a part of town business was a disputed issue subject to competing evidence available to defendant Chapman at the time leading up to the indictment. For purposes of the instant motions, this is not a basis for a claim of concealment or fabrication of evidence in violation of the Fourth Amendment. "It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge[,] . . . and to make the assessment it has always been thought sufficient to hear only the prosecutor's side." United States v. Williams, 504 U.S. 36, 51 (1992) (quotations omitted). Thus, "an officer is not required to exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." Miller, 475 F.3d at 630. Accordingly, an officer's mere "failure to disclose exculpatory evidence" does not state a claim for a constitutional violation. Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005). At bottom, while plaintiff suggests defendant Chapman should have done more to find and present evidence to the grand jury supporting her case in defense, the Constitution did not require defendant Chapman to do so.

Plaintiff objects to consideration of SBI interview and file memoranda on the basis that they constitute inadmissible hearsay, are not based on personal knowledge, and are not authenticated. These objections, however, are without merit and are overruled.

First, with respect to hearsay, Federal Rule of Evidence 802 precludes admission of "hearsay." Fed. R. Evid. 802. However, "[o]ut-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." Anderson v. United States, 417 U.S. 211, 219 (1974); see Fed. R. Evid. 801(c). Accordingly, "[a] statement that would otherwise be hearsay may nevertheless be admissible if it is offered to prove something other than its truth, and this includes statements used to charge a party with knowledge of certain information." In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig., 810 F.3d 913, 925–26 (4th Cir. 2016). For example, the court in United States v. Bolick, 917 F.2d 135, 155–56 (4th Cir. 1990) upheld admission of statements made by witnesses to agents not for their truth, but rather for "providing explanation for such matters as the understanding or intent with which certain acts were performed" or "showing the basis for the actions taken by the government." Id. Likewise, in United States v. Hunt, 749 F.2d 1078, 1084 (4th Cir. 1984), statements obtained in a government investigation were admissible not for their truth but rather "to refute criticism of the government's decision to launch" its investigation. Id.

In this manner, statements contained in SBI interview and file memoranda are not offered and considered for the truth of the matter asserted, e.g., whether the Economic Development Committee did or did not in fact exist, but rather to show defendants' knowledge and intent and basis for the investigation and prosecution of plaintiff. Accordingly, the statements in the SBI interview and file memoranda are not inadmissible hearsay. In addition, to the extent the memoranda themselves constitute an additional level of hearsay, the memoranda themselves are not excluded by the rule against hearsay because they are records of a regularly conducted activity and public records under Rule 803(6) and 803(8). Thus, plaintiff's objections on the basis of hearsay are unavailing.

Second, with respect to personal knowledge, Rule 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. However, "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Id. Furthermore, on summary judgment, the court may consider the "content or substance of . . . materials where the 'the party submitting the evidence shows that it will be possible to put the information into an admissible form.'" Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015) (quoting 11 James Wm. Moore et al., Moore's Federal Practice § 56.91[2] (3d ed. 2015)). Here, where defendant Chapman has testified in depositions and is available to testify regarding her own personal knowledge regarding the SBI memoranda, plaintiff's objection based upon Rule 602 is without merit.

Finally, with respect to authenticity, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Here, the SBI memoranda are in a form that they may be authenticated by testimony of defendant Chapman or other witness. In addition, defendants have filed a declaration of Nathaniel L. McLean, Administrative Officer for the Case Records Management System for SBI, which further confirms the authenticity of the SBI memoranda. Therefore, plaintiff's objection on this basis is without merit.

Plaintiff also argues that Montanye's comment "well . . . here goes my case" upon seeing a folder marked "Economic Development Committee," when searching LGC offices in September 2014, demonstrates concealment and fabrication on the part of defendant Chapman. (Pl's Resp. (DE 204) at 17; Pl's Reply (DE 216) at 6). Plaintiff suggests that the discovery of this folder, as well as original receipts in LGC offices, shows that defendant Chapman, in concert with other

defendants, must have known about the existence of such additional exculpatory documentation but recklessly or purposefully failed to disclose it to prosecutors.  (See id.).

This argument is unavailing on multiple levels.  First, the materials located in September 2014 regarding "Economic Development" in the Town (see DE 187-53) are similar in substance to the materials attached to defendant Chapman's June 6, 2013, SBI file memorandum.  (See DE 191-46).  For example, the materials located in September 2014 include a "draft #1 8.6.2010" "Princeville Comprehensive Economic Development" report by Smith. (DE 187-53 at 8-9).  The materials attached to Chapman's file memorandum include a "Princeville Comprehensive Economic Development" report by Smith that is not marked "draft."  (DE 191-46 at 4-5).  The materials attached to Chapman's file memorandum go one step further, and they include "Economic Development Progress Report[s]" "Prepared for the Mayor" describing work by plaintiff and Town Manager, with Smith, towards "Princeville Economic Development efforts and initiatives."  (Id. at 28-35).   Thus it is not plausible to draw an inference of concealment on the part of defendant Chapman where she already collected and disclosed in her file provided to prosecutors prior to indictment similar documentation.

Second, the existence or non-existence of original receipts was not determinative of the prosecution of plaintiff.  For example, Montanye considered a draft indictment that included reference to "Economic Development Commission" next to each transaction being considered for a charge, even though some stated "Receipt provided" or "No receipt provided." (DE 191-30).  In reference to this document, she testified, "as you can tell, it didn't really make a difference whether a receipt was provided or not."  (Montanye Dep. at 56).   A receipt alone was insufficient to establish that any individual charge on the Town credit card was authorized and for a legitimate Town business purpose. (See, e.g., Edmundson Dep. 92-93; Edmundson Decl., Ex. C (DE 191-2

at 29, 40), Ex. D (191-2 at 50); Montanye Dep. 122, 166; Montanye Decl. Ex. A (DE 187-70 at 2-3, 6-7); Re-Released OSA audit report (DE 186-16 at 11-12); Pl's Opp. Stmt. (DE 200) ¶¶ 33-34 ("[I]temized receipts are necessary but not sufficient documentation for town expenditures. While itemized receipts show that expenditure was made, they do not show that the expenditure was made for a legitimate business purpose. Similarly, general statements that expenditure was for town business or for a meeting are also inadequate to show that the expenditure was made for a legitimate business purpose.").

Third, the fact that additional original receipts were located in defendant Edmundson's office in September 2014 is not material to the issue of whether defendant Chapman concealed or fabricated evidence prior to the indictment in August 2013. There is no plausible basis to infer purposeful concealment of receipts by or from defendant Chapman, because the presence of Town financial records in the LGC offices was known by prosecutors in and before August 2013. (See, e.g., May 21, 2013 SBI memorandum, enclosing Watts letter (DE 187-66 at 23); Montanye Dep. 186-187). While plaintiff suggests that prosecutors relied upon representations by defendants about what was in those records, there is no evidence that defendant Chapman or prosecutors were prevented from examining any or all of the records in LGC offices themselves at any point prior to the indictment. (See Chapman Dep. 71, 92-93; Montanye Dep. 186-187). As noted above, prosecutors were already on notice through the SBI file of plaintiff's contentions that all pertinent Town financial records were then in 2013 in LGC control and custody. (See May 21, 2013 SBI memorandum, enclosing Watts letter (DE 187-66 at 25, 26-27)).

At bottom, prosecutors had before August 2013 ample information to question the viability of the prosecution, and the nearly insurmountable challenges of prosecuting such a case in light of: 1) sparring factions and disunity on the Town board of commissioners, (see, e.g., May 21, 2013

SBI memorandum, enclosing Watts letter (DE 187-66 at 25, 26-27); OSA audit report (DE 186-15 at 27, 29; June 28, 2013, email from Andrews to Chapman (DE 187-25)); 2) evidentiary challenges associated with the volume of Town financial documents in LGC offices, amounting to approximately 35,000-50,000 pages of documents (see Defs' Resp. to Pl's Stmt. of Facts (DE 196) ¶ 190); and 3) a blurred line between admitted "clear evidence" of "poor financial management and record keeping by Town management" and evidence of "embezzlement" (May 21, 2013 SBI memorandum, enclosing Watts letter (DE 187-66 at 24-25). Prosecutors alone had responsibility for proceeding with indictment, despite being privy to all of the aforementioned circumstances. See Rehberg, 566 U.S. at 372 ("[I]t is the prosecutor, who is shielded by absolute immunity, who is actually responsible for the decision to prosecute.").

Finally, the nature of the charges and the evidentiary issues presented to prosecutors was such that this case is categorically different from other cases in which courts have considered a Fourth Amendment claim against police officers due to concealment or fabrication of evidence. For example, in Durham v. Horner, 690 F.3d 183, 187 (4th Cir. 2012) "the wrong person had been indicted and arrested" for a drug transaction with a confidential informant. Id. Likewise, in Smith v. Munday, 848 F.3d 248, 255 (4th Cir. 2017), applied for a warrant for arrest, without "any evidence connecting [plaintiff] to the crime in question." Id. Here, by contrast, the identity of the criminal defendant was not at issue; rather, the critical issue as recognized by prosecutors was the legitimacy and support for charges made on the Town credit card, an issue subject of competing subjective evidence and inferences. Even after dismissal of charges against plaintiff, prosecutors did not state plaintiff was innocent of the charges, but rather that credibility issues and evidence made prosecution not in the interest of justice. (See, e.g., Montanye Dep. 122 ("[A]lthough there may be some other things that I might be able to dig around and find, just given the credibility and

discovery issues in the case, there was no need to try and pursue anything further"); 166 (Q Now, when you made the decision to dismiss . . . was there sufficient evidence in your opinion to go forward on any of those charges?  A There may have been."); Montanye Decl. Ex. A (DE 187-70 at 2-3, 6-7).

In sum, for all these reasons, individually and collectively, discovery of additional original receipts and Economic Development Committee materials in LGC offices in September 2014 does not give rise to a plausible inference that defendant Chapman concealed or fabricated evidence in violation of plaintiff's Fourth Amendment rights.

Plaintiff also points to meetings and communications between defendant Chapman and other defendants as evidence of an intent to conceal or fabricate evidence before the grand jury. For example, plaintiff notes that defendant Chapman was involved with investigating plaintiff prior to a formal request by district attorney Evans on April 18, 2013, allegedly in violation of SBI policy and procedure.  Plaintiff notes that defendant Chapman was brought on to assist the OSA, as documented in an OSA interview memorandum on October 23, 2012, and one SBI agent reportedly "suggested that we meet with the Edgecomb [sic] County District Attorney to apprise him/her of what we're planning to do in Princeville."  (DE 197-5 at 23-24).  Plaintiff points to an October 29, 2012, email from Long to McNeill stating "[w]e are conducting an investigation regarding fraud, waste, or abuse of public funds in the [Town]," and "assignment of an African American agent would be preferable."  (DE 197-5 at 31).  However, none of this evidence individually or collectively is pertinent to whether defendant Chapman concealed or fabricated evidence before prosecutors or the grand jury, either by her own initiative or in concert with the other defendants.  There is no discussion of concealment or fabrication of evidence, indeed no discussion of any evidence to be presented or the manner of presentation, or any other topic that

would permit a plausible inference of intent to conceal or fabricate evidence. In light of all the undisputed evidence in the record discussed previously, evidence merely suggesting early involvement by defendant Chapman contrary to SBI policy or coordination with other defendants on investigation of plaintiff is not sufficient to support plaintiff's claims against defendant Chapman.

In sum, plaintiff fails to establish a genuine issue of material fact regarding concealment or fabrication of evidence by defendant Chapman. Thus, plaintiff's claims against defendant Chapman for concealing and fabricating evidence in violation of the Fourth Amendment fail as a matter of law, and the court does not reach defendant Chapman's defense of qualified immunity. Accordingly, defendant Chapman's motion for summary judgment on these claims is granted and plaintiff's motion for summary judgment pertaining to these claims is denied.

2. Claims for Conspiring or Causing Defendant Chapman to Conceal or Fabricate Evidence

Section 1983 imposes liability on any person who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights." 42 U.S.C. § 1983. The Fourth Circuit has interpreted § 1983 to encompass a cause of action for conspiracy. "To establish a civil conspiracy under § 1983," a plaintiff must allege that defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, W.Va., 81 F.3d 416, 421 (4th Cir. 1996). It is "a weighty burden to establish a civil rights conspiracy." Id. "While [a plaintiff] need not produce direct evidence of a meeting of the minds," a plaintiff must allege "that each member of the alleged conspiracy shared the same conspiratorial objective." Id. A plaintiff's allegations "must, at least,

reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Id.

Plaintiff's conspiracy claim fails as an initial matter because plaintiff has not shown an underlying deprivation of a constitutional right. As set forth in the preceding section, plaintiff has not demonstrated a genuine issue of material fact that defendant Chapman concealed or fabricated evidence before the grand jury. Absent an underlying constitutional violation by defendant Chapman, the remaining defendants cannot be liable for causing Chapman to violate plaintiff's rights or conspiring to deprive plaintiff of her constitutional rights. See Hinkle, 81 F.3d at 421 (stating that a plaintiff must show that defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right") (emphasis added); Clark v. Link, 855 F.2d 156, 161 (4th Cir. 1988) (stating, in dismissing § 1983 conspiracy action, "[i]f there is no violation of a federal right, there is no basis for a section 1983 action"); cf. Hill v. Shobe, 93 F.3d 418, 422 (7th Cir. 1996) ("For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights: there is no constitutional violation in conspiring to cover up an action which does not itself violate the constitution."). Accordingly, plaintiff's § 1983 claim against defendants based upon causing a constitutional violation or conspiring to violate plaintiff's Fourth Amendment rights must be dismissed as a matter of law.

In addition, and in the alternative, plaintiff has not established a genuine issue of material fact "that each member of the alleged conspiracy shared the same conspiratorial objective" and "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Hinkle, 81 F.3d at 421. Plaintiff's asserted evidence of conspiracy is dependent upon linking separate events and circumstantial evidence to show a common conspiratorial objective.

This evidence, individually and in combination, however, is insufficient to create a plausible inference of conspiracy. Instead, the inferences that plaintiff seeks to draw are too attenuated and speculative to create a genuine issue of fact.

For example, plaintiff asserts that defendants Holloman, Hammond, and Edmundson (the "LGC defendants") "acted in concert to take over the Town of Princeville's finances despite the fact that the Mayor Oates had made great progress in correcting financial issues in Princeville . . . and despite the fact that never before had the LGC assumed control of the finances of a town that was in the positive." (Pl's Resp. (DE 199) at 9) (citations omitted). This assertion both misrepresents the evidence and is immaterial. In fact, at the time LGC assumed control of Town finances, the Town had received an independent audit that gave a qualified opinion in its financial statements:

> We were unable to verify the Town's assertions regarding existence, obligations, completeness, rights and obligations, valuation, application of cut off procedures and accuracy and classification on the Town's accounts receivable and related revenues, the Town's accounts payable and related expenditures and the Town's payroll expenditures and related liabilities due [sic] the degree of inconsistencies and errors noted in the accounting records and due to the lack of internal controls over the Town's financial operations.

(DE 186-9 at 4). The audit found 19 separate "material weaknesses" in the town's internal controls. (Id. at 46). One such weakness included the following findings: "Documentation for some checks and deposits were missing. . . . Credit card statement transactions are not supported by the original credit card receipt in all cases. . . . $23,498 expenditures supported by incomplete or inadequate documentation." (Id. at 52). The LGC warned the Town on July 5, 2012, of multiple issues that could result in impounding the books and records of the Town if not corrected: 1) "Potential for Future Default on Debt"; and 2) "Lack of Compliance With the Local Government Budget and Fiscal Control Act" in 11 separate respects. (DE 191 at 9-13). In these circumstances, actions by LGC to impound books and records of the town do not support an inference of

conspiratorial objective to conceal and fabricate evidence; if anything, the LGC defendants had grounds from the outset to be suspicious of improprieties on the part of Town management.

Plaintiff also asserts: "Though the LGC defendants had actual knowledge of criminal conduct by Mr. Knight and Mr. Richardson, they did nothing to investigate either of those two men and in fact admitted during deposition testimony that the LGC defendants made no such effort to personally investigate any Town of Princeville official or employee, other than Plaintiff." (Pl's Resp. (DE 199) at 8). Again, this assertion misrepresents the evidence, and it is in any event immaterial to plaintiff's claims. In fact, defendants determined through interviews with SBI agents that an investigation had already been undertaken regarding Mr. Knight and Mr. Richardson, and that investigations had already been undertaken regarding additional allegations made by plaintiff concerning Howell and Knight. (October 23, 2012, and November 29, 2012, OSA Interview Memoranda (DE 191-15 and 191-17). In any event, defendants had ample reason to focus on then-recent conduct concerning plaintiff's term as mayor, rather than information that had already been covered in an investigation performed in 2007. Thus, plaintiff's assertion regarding criminal conduct of others is immaterial to her claim of conspiracy to conceal and fabricate evidence against defendants.

As another basis for her conspiracy claim, plaintiff asserts: "the LGC defendants met with Barry Long, Chapman and each other on multiple occasions including meetings where the seized financial records were reviewed and discussed." (Pl's Resp. (DE 199) at 8). This assertion is immaterial to plaintiff's conspiracy claim because the evidence described does not permit a plausible inference that defendants discussed a purpose or plan to conceal or fabricate evidence, and it does not permit a plausible inference that they intended to conceal or fabricate evidence.

For instance, plaintiff cites deposition testimony by Edmundson, Hammond, and Long regarding meetings held at LGC offices and OSA offices in October 2012 and visits by Long and Matthews to LGC offices to review documents. The cited deposition testimony describing meetings and document review, however, is insufficiently precise to permit any inference of conspiracy to conceal or fabricate. (See, e.g., Long Dep. 17-18, 54-56, 105; Hammond Dep. 72-76; Edmundson Dep. 126-131; Holloman Dep. 72-73). Plaintiff also cites deposition testimony regarding conversations between LGC defendants and Montanye or defendant Chapman. (See, e.g., Reply (DE 216) at 8). Again, however, the cited deposition testimony describing such conversations does not permit an inference of concealment or fabrication, particularly in light of undisputed facts regarding defendant Chapman's investigation and investigative file set forth above with respect to plaintiff's claim against defendant Chapman. (See, e.g., Holloman Dep. 75-76; Long Dep. 189; Edmundson Dep. 88-91, 131-134; Montanye Dep. 66-68, 181).

With respect to defendant Wood, plaintiff asserts she participated in the conspiracy by virtue of a reference to her on an OSA "hotline complaint." (Pl's Resp. (DE 208) at 7). That form, however, states that "One or more members of the Local Government Commission" reported an allegation of "[m]issue of funds" to David King. (DE 197-5 at 22). In one section of the form, under "METHOD OF HANDLING" under "Reason for Open," the form states "Requested by Beth Wood." (Id.). Where defendant Wood herself is a member of the LGC, and where the OSA is acting well within its duties to investigate misuse of funds in the Town, this form does not give rise to an inference of a conspiracy to conceal or fabricate evidence. Plaintiff also cites to defendant Wood's failure to incorporate the Town attorney's response into to the April 2013 OSA audit report, and her handling of response procedures. (Pl's Resp. (DE 208) at 7). The report, however, expressly discusses the Town attorney's response and the procedures regarding the

same. (DE 186-15 at 27). Further, the Town attorney's response was made part of the SBI file provided to prosecutors. (DE 187-66 at 23). Thus, the evidence permits no inference Wood joined a conspiracy to conceal or fabricate evidence.

Plaintiff also cites to the LGC defendants' conduct after issuance of the indictment as evidence that they conspired prior to the indictment to conceal or fabricate evidence. For example, plaintiff cites to their responses to subpoenas and public records requests regarding "what records they had and what records they produced," and statements that "they had no additional documents pertaining to Princeville despite having absolutely no record or log of what they claimed to have turned over." (Pl's Resp. (DE 199) at 10). Plaintiff points to documents including an envelope of receipts in a box in defendant Edmundson's office in September 2014. (Id. at 11). In light of multiple factors, it is too attenuated and speculative to infer, based upon such LGC defendants' conduct after the issuance of the indictment that they intended to conceal or fabricate evidence prior to issuance of the indictment.

In particular, it is undisputed that 1) the volume of documents in LGC offices prior to issuance of the indictment was overwhelming and in disarray and remained disorganized even in September 2014 (DE 187-49); 2) there was no log or inventory of documents seized nor log or inventory of documents produced (Hammond Dep. 276); and 3) the September 2014 site visit came more than a year after the indictment, following extended correspondence and proceedings focused on document requests and productions. In addition, even after discovery in September 2014, neither the LGC defendants nor prosecutors testified that the documents located proved plaintiff's innocence. To the contrary, as discussed previously, the key issue in the case concerned the legitimacy of the expenditures purported to be for the Economic Development Committee and the justification for such expenditures, which issue was not resolved by documents identified in

September 2014. (See, e.g., Edmundson Dep. 92-93; Edmundson Decl., Ex. C (DE 191-2 at 29, 40), Ex. D (191-2 at 50); Montanye Dep. 122, 166; Montanye Decl. Ex. A (DE 187-70 at 2-3, 6-7); Re-Released OSA audit report (DE 186-16 at 11-12); Pl's Opp. Stmt. (DE 200) ¶¶ 33-34).

Plaintiff also suggests that she can proceed on her conspiracy claim against defendants because it is clearly established that "due process rights can be violated where defendants had actual knowledge of plaintiff's innocence yet persisted in his detention and prosecution," and that defendants were "working in concert to deny Plaintiff access to the documents, which were exculpatory in nature." (Pl's Resp. (DE 199) at 12, 14). As an initial matter, such assertions relate to hypothetical claims that are not before the court: the LGC defendants did not detain or prosecute plaintiff. Moreover, denial to plaintiff of access to documents post-indictment and during prosecution is a different claim from concealment and fabrication of evidence before the grand jury. Finally, and most critically, the premise of plaintiff's argument is flawed. For the reasons stated above, there is no basis upon which to infer that any of the defendants had actual knowledge or plaintiff's innocence, either post-indictment, or particularly pre-indictment.

In sum, plaintiff fails to establish a genuine issue of material fact regarding whether any and all defendants caused defendant Chapman, or conspired with defendant Chapman or others, to conceal or fabricate evidence before the grand jury. Thus, plaintiff's § 1983 conspiracy claims against defendants fail as a matter of law, and the court does not reach defendants' additional defenses of qualified immunity. Accordingly, defendants' motions for summary judgment on these claims is granted and plaintiff's motion for summary judgment pertaining to these claims is denied.

## CONCLUSION

Based on the foregoing, defendants' motions for summary judgment (DE 175, 184, 189), are GRANTED, and plaintiff's claims are dismissed as a matter of law. Plaintiff's motion for summary judgment (DE 178) is DENIED. Plaintiff's motion (DE 194) for leave to file an amended memorandum and statement of undisputed material facts, is GRANTED on the terms set forth herein. The clerk is DIRECTED to close this case.

SO ORDERED, this the 14th day of January, 2020.

LOUISE W. FLANAGAN
United States District Judge